UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
BRYSON CITY DIVISION

| | |
|---|---|
| SOUTHERN FOUR WHEEL DRIVE ASSOC., UNITED FOUR WHEEL DRIVE ASSOCIATIONS, THE BLUERIBBON COALITION, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES FOREST SERVICE, NANTAHALA NATIONAL FOREST, MARISUE HILLIARD, Forest Supervisor, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> CIVIL ACTION NO.: _____ |

## **COMPLAINT**

### **NATURE OF ACTION**

1.       This action seeks declaratory and injunctive relief requiring Defendants United States Forest Service, Nantahala National Forest, and Marisue Hilliard (the "Forest Service") to acknowledge and adhere to controlling law while managing recreational access to the Upper Tellico Off-Highway Vehicle ("OHV") System of the Forest.

2.       Plaintiffs specifically challenge the Forest's decision(s) to prohibit and restrict vehicular access along previously-open roads and trails through various actions, one or more of which constitute final agency action, specifically including the Forest Supervisor's Orders and Decision Memo dated December 20, 2007 (the "Interim Orders"), the continuation of those closures through Forest Supervisor's Orders and Decision Memo dated  March 31, 2009 (the "Second Interim Orders") and the Decision Notice/Finding of No Significant Impact ("DN/FONSI") dated October 14, 2009, and associated Environmental Assessment ("EA").

COMPLAINT -- 1

3. Regardless of the ultimate resolution of Plaintiffs' challenges to the Interim Orders and/or DN/FONSI, the Forest is additionally violating applicable law by proceeding with "decommissioning" activities on certain System routes. Decommissioning involves removal of culverts and existing drainage structures, and the use of heavy equipment to fill, recontour and otherwise eliminate the existing road prism. The specific methods of such ground-disturbing closure activities or the impacts potentially associated with them have not been disclosed to the public or analyzed in accordance with law.

4. This action arises under the National Forest Management Act, 16 U.S.C. § 1600 et seq. ("NFMA"); the National Environmental Policy Act, 42 U.S.C. § 4331, et seq. ("NEPA"); the Administrative Procedure Act, 5 U.S.C. § 551, et seq. (the "APA"), and implementing regulations for these statutes.

## JURISDICTION AND VENUE

5. Jurisdiction is proper in this Court under 28 U.S.C. § 1331 because this action arises under the laws of the United States. The conduct complained of creates an actual, justiciable controversy and is made reviewable under the APA.

6. Venue is proper in this Court under 28 U.S.C. § 1391(e) because a substantial number of the events or omissions giving rise to these claims occurred, or, a substantial part of the property that is the subject of these claims is situated, within the Western District of North Carolina. The Decision was issued from the Forest's office in Asheville, North Carolina.

## PARTIES

7. Plaintiff Southern Four Wheel Drive Association ("Southern") is a nonprofit organization formed in 1987 and dedicated to promoting four-wheel drive recreation, responsible land usage, conservation and education. Southern is an association of member clubs located in

COMPLAINT -- 2

the southeastern U.S. including Alabama, Georgia, Kentucky, North Carolina, South Carolina and Tennessee. Southern members have long visited the Forest and the System, have assisted to the extent allowed by the Forest Service in active management of vehicle travel, and have definite and concrete plans to access the Forest and the System via motorized vehicles in the future, to the extent authorized by the Forest Service.

8. Plaintiff United Four Wheel Drive Associations ("UFWDA") consists of more than 10,000 individuals, clubs, and associations who share a common interest in recreational off-road activities, including the use of four-wheel-drive vehicles. UFWDA has members in each of the 50 states and in several foreign countries. Our members access federal public lands throughout the United States, including lands within the Nantahala National Forest and the Upper Tellico OHV System, to the extent authorized by the Forest Service. UFWDA members have definite and concrete plans to access the Forest and the System via motorized vehicles in the future, to the extent authorized by the Forest Service.

9. Plaintiff The Blue Ribbon Coalition, Inc. ("BlueRibbon") is an Idaho nonprofit corporation representing over 1,100 businesses and organizations with approximately 600,000 members nationwide. BlueRibbon members use motorized and nonmotorized means, including off-highway vehicles, horses, mountain bikes, and hiking, to access Forest Service and other public lands throughout the United States, including such lands in North Carolina. BlueRibbon has a long-standing interest in the protection of the values and natural resources addressed herein, and regularly works with land managers to provide recreation opportunities, preserve resources, and promote cooperation between public land visitors. BlueRibbon members have visited the Forest via the above-described means of access and intend to do so in the future. BlueRibbon members submitted input to the Forest and otherwise participated to the extent

public participation was allowed into the process that generated the Interim Orders and DN/FONSI.

10.     Defendant United States Forest Service is a federal agency within the United States Department of Agriculture.  The Forest Service is charged with administering and overseeing United States Forest System lands in accordance with applicable law.

11.     Defendant Nantahala National Forest is a subunit of the United States Forest Service comprised of over 531,000 acres of land located in North Carolina.  The Forest's main office is located in Asheville, North Carolina.

12.     Defendant Marisue Hilliard is the Forest Supervisor for the Nantahala.  As her title implies, she is the supervisor for the Forest and is the ultimate authority for the actions, procedures and decisions of the Forest and is charged with ensuring the Forest complies with applicable law.   She supervised the processes and signed the agency action(s) at issue herein. She is sued solely in her official capacity.

## LEGAL FRAMEWORK

13.     The APA addresses and regulates the function of executive branch administrative agencies within our system of open government.  Among such functions, the APA represents a waiver of sovereign immunity by the United States and outlines the circumstances in which "final agency action" may be subject to judicial review, as well as the standards of review to be applied in such challenges.  Since many statutes and regulations do not provide for a private right of action, the APA provides the jurisdictional basis for judicial review of administrative decisions by federal land management agencies applying statutes like NEPA and NFMA to public lands like the Forest.

COMPLAINT -- 4

14.    NEPA represents "our basic national charter for protection of the environment."
40 C.F.R. § 1500.1.  NEPA's protections of the "environment" refer to the "human environment"
which "shall be interpreted comprehensively to include the natural and physical environment and
the relationship of people with that environment."  40 C.F.R. § 1508.14.  Among its numerous
purposes, NEPA procedures are designed to foster informed agency decisionmaking based upon
informed public participation.

15.    NFMA establishes the statutory framework for management of the National
Forest System.  In NFMA and other statutes, "Congress has consistently acknowledged that the
Forest Service must balance competing demands in managing National Forest System lands.
Indeed, since Congress' early regulation of the national forests, it has never been the case that
"the national forests were…to be 'set aside for non-use.'" *The Lands Council v. McNair*, 537
F.3d 981, 990 (9th Cir. 2008) (citations omitted).  Additional guidance, incorporated expressly
within NFMA, is offered in the Multiple-Use Sustained Yield Act ("MUSYA"), which provides
that the various surface resources be managed "so that they are utilized in the combination that
will best meet the needs of the American people" and to "achieve[ ] and maintain[ ] in perpetuity
[ ] a high-level annual or regular periodic output of the various renewable resources of the
national forests without impairment of the productivity of the land."  16 U.S.C. § 531(a)
(definition of "multiple use") and (b) (definition of "sustained yield"); 16 U.S.C. § 1604(g)
(incorporating MUSYA provisions in NFMA).

16.    NFMA procedurally requires the Forest to prepare and revise a "forest plan."  16
U.S.C. § 1604.  A forest plan lays out broad guidelines to advance numerous goals and
objectives, including to "insure consideration of the economic and environmental aspects of
various systems of renewable resource management, including the related systems of silviculture

COMPLAINT -- 5

and protection of forest resource, to provide for outdoor recreation (including wilderness), range, timber, watershed, wildlife, and fish…." *Id.* at (g)(3)(A). These plans contain desired conditions, objectives and guidance for project and activity decisionmaking, but do not approve or execute projects and activities. 36 C.F.R. § 219.3 (2007). The guidance in the Forest Plan is subject to change through plan amendment in site-specific or project-level planning, or through revision of the Forest Plan itself. 36 C.F.R. § 219.12 (2007). Additional guidance and criteria are presented in activity-specific rules, such as the Travel Management Rule provides for motorized access to the Forest System.

17. On November 9, 2005, the Forest Service published in the Federal Register a Final Rule entitled "Travel Management; Designated Routes and Systems for Motor Vehicle Use." 70 Fed.Reg. 68264-68291 (Nov. 9, 2005) (the "Travel Management Rule"). The Travel Management Rule was issued following publication of, and receipt of public comment upon, a proposed rule and was otherwise promulgated in accordance with notice-and-comment rulemaking procedures of the APA. As such, the Travel Management Rule carries force and effect of law and the procedures and provisions therein are binding upon the Forest Service.

18. The Travel Management Rule generally "requires designation of those roads, trails and Systems that are open to motor vehicle use…and will prohibit the use of motor vehicles off the designated system, as well as use of motor vehicles on routes and in Systems that is not consistent with the designations." 70 Fed.Reg. 68264 (Nov. 9, 2005).

19. The Travel Management Rule requires the agency to apply "general criteria" when designating roads, trails and Systems for vehicle use, which include effects on natural and cultural resources, public safety, provision of recreational opportunities, access needs, conflicts among uses of National Forest System lands, the need for maintenance and administration of

roads, trails and Systems, and the availability of resources for maintenance and administration. 36 C.F.R. § 212.55(a). The Travel Management Rule further includes "specific criteria" which must be considered, "with the objective of minimizing" effects on specified resources including soils, watersheds, wildlife and associated habitats and conflicts between vehicle and other uses and within vehicle use types. *Id.* at (b).

## GENERAL ALLEGATIONS

20.     The Nantahala Forest encompasses over 531,000 acres of land in North Carolina. These lands range from dry yellow pines to a variety of moist cover and upland oak forests, to high-elevation northern hardwood and spruce forests. About 1,900 types of plants and 300 to 400 species of vertebrate animals are found in the Forest. Fiscal Year 2006 data reveal that "driving for pleasure" constitutes over 17 percent of recreation site visits to National Forests in North Carolina. While these Forests have approximately 2,560 miles of road within Forest Service jurisdiction, approximately 1,556 miles of those roads are normally closed to public vehicle use.

21.     The Forest includes the Upper Tellico OHV System located within the Tusquitee Ranger District of the Forest (the "System"). The System, like much of the Forest, contains a variety of vegetation types punctuated by streams and relatively deep gorges. Much of this terrain was heavily logged during or before the 1960's and later purchased by the Forest Service. The System consists of approximately 8,000 acres and now includes twelve (12) formally designated trails that encompass a total of about 38 miles. These trails involve a variety of terrain and challenges ranging from relatively easy routes to extremely challenging routes requiring advanced equipment and operator skill/experience. As a result of these unique opportunities, the System is a destination for "jeep" and "four wheel drive" OHV enthusiasts

COMPLAINT -- 7

from throughout the country and is an unparalleled site in the eastern United States for the four-wheel drive community.

22.     The term "off-highway vehicle" is formally defined as "[a]ny motor vehicle designed for or capable of cross-country travel on or immediately over land, water, sand, snow, ice, marsh, swampland, or other natural terrain." 36 C.F.R. § 212.1 (2006). A wide spectrum of vehicles are generally understood to meet this definition including motorcycles, all-terrain vehicles, snowmobiles, jeeps and factory stock sports utility vehicles.

23.     OHVs are a traditional and popular means of visiting National Forest System lands. This access occurs as a means to other activities, such as sightseeing, picnicking, camping, photography, hunting, fishing, wildlife study and similar outdoor pursuits. In addition, some enthusiasts derive enjoyment and satisfaction from the act of traveling through the Forest in their vehicle and the associated navigational, operational and mechanical challenges potentially associated with such travel.

24.     The routes associated with continuing or past OHV activity are often fundamental to other forms of recreation, including nonmotorized recreation. Routes open to vehicle travel are shared with nonmotorized recreationists. Routes closed to vehicle travel but remaining on the ground can create exclusive use for nonmotorized recreationists, including hikers, equestrians, mountain bikers, or others.

25.     In addition to its supporters and enthusiasts, OHV travel has its detractors. Opponents to OHV access on the Forest have more closely targeted riding in the Upper Tellico OHV System in recent years, applying their energies and resources to a campaign including political, administrative, legal and public relations strategies ultimately designed to eliminate meaningful OHV access to the System.

COMPLAINT -- 8

26.     Mindful of the potential issues and controversy surrounding OHV use in general and on the Forest, Plaintiffs and their members have long attempted to educate their members, forge effective and collaborative relationships with land managers and other interest groups, and proactively address resource concerns potentially associated with vehicle use.   Plaintiff organizations and their members conduct trail maintenance work in the System several times each year in conjunction with Forest Service oversight.  Typical trail maintenance activities have included movement of rock for trail stabilization, adding signage, planting seed and fertilizing new plantings.  During the months of May, June, and July, 2007 trail work included hauling over 250 tons of surge stone for trail stabilization; repairing, cleaning, and installing over 150 water bars and silt traps;  repair of Fain's Ford Crossing; repairing and replacing 2 culverts; closing 6 illegal trails/bypasses; donating 698.5 volunteer hours and donating 1,003.5 hours of heavy machine time.  At the "Tellico Cleanup Day" on March 10, 2007, Defendant's reported volunteer pickup and removal of 213 bags of trash and 2,400 pounds of trash removed in North Carolina by 212 participants.  Plaintiffs' members constituted 116 of the 212 participants, while Trout Unlimited members constituted 23 of the 212 participants.

27.     Following these efforts the Southern Environmental Law Center sent a letter to the Forest in June, 2007 on behalf of several organizations including Public Employees for Environmental Responsibility ("PEER"), Tennessee Chapter, Wild South and Trout Unlimited, North Carolina and Tennessee Councils, styled as a "notice of intent to sue" under the Clean Water Act for alleged violations of that and related statutes arising from continuing OHV use of the System (the "NOI").

28.     The NOI specifically requested "at a minimum, remedial measures for the Tellico ORV trail system must include year-round closure of the trails known to be degrading water

quality and seasonal closure of the entire system during the wettest months of the year". NOI at 5. The NOI further requested immediate action to address alleged Clean Water Act violations including unpermitted discharge of pollutants (NOI at 5), unpermitted discharge of dredged and fill material (NOI at 6); violations of state water quality laws and standards in both North Carolina (NOI at 7) and Tennessee (NOI at 10); violations of National Environmental Policy Act, the National Forest Management Act and Forest Service regulations (NOI at 11).

29. In apparent response to the NOI, the Forest held at least several meetings. At least one meeting was open to the public and included representatives from numerous interest-group perspectives. Other meetings were not open to the public and involved only the Forest and hand-picked representatives of the preservationist special interests opposed to ongoing vehicle access in the System.

30. The Forest outlined a list of options designed to address the concerns raised in the NOI and subsequent meetings. These options included varied procedures and outcomes, ranging from further survey/assessment to "permanent closure and rehabilitation" of identified trails.

31. Plaintiffs UFWDA and BlueRibbon sent a letter, through their counsel, dated August 22, 2007 to the Forest advising of concerns over "the possibility of detailed settlement discussions" between the Forest and the groups who filed the NOI and requesting involvement in discussions of any such nature between the agency and special interests.

32. The Forest sent out a "scoping notice" dated September 17, 2007 soliciting public comment on two proposed "Forest Supervisor's Orders" in the System. One proposed order would prohibit motorized vehicles on Lower Trail 2, Trail 7, and Trail 9, duration of order not to exceed one year or until a reasonable plan is in place to prevent adverse impacts to the aquatic resource. The other proposed order would prohibit winter-time motorized vehicle use on the

COMPLAINT -- 10

Upper Tellico OHV Trail System from January 1 to March 31 each year. This would include all trails in the system except Trail 1 and the upper section of Trail 2 which would remain open as system roads used by vehicles types normally found on public roads.

33. During this same time in September, 2007 the Forest initiated an "engineering survey and assessment" to evaluate a variety of issues articulated or implicated by the NOI.

34. The Forest received a variety of responses to the scoping notice, including one dated September 25, 2007 signed by counsel for Plaintiffs UFWDA and BlueRibbon.

35. On November 19, 2007 Forest representatives held a meeting with Plaintiff organizations' representatives which the Forest indicated was to be an "informational" meeting in which to report on the progress of the "survey and assessment" and to discuss various short- and long-term strategies to manage OHV travel in the System and to appropriately avoid or mitigate any adverse effects associated with such travel.

36. Approximately one month after this meeting the Forest issued the Interim Orders on December 20, 2007 which purports to "put into effect two Forest Supervisor's Orders" restricting OHV use in the System. The first action consists of "a one-year closure" of Lower Trail 2, Trail 7, a portion of Trail 8 and Trail 9 which prohibits operation of motor vehicles during the closure period. The second action is an System-wide "seasonal closure" which prohibits operation of motor vehicles between January 1 and March 31 each year.

37. The practical effect of the Decision was to eliminate meaningful vehicle access to the System. Navigating and riding along the trail segments closed by the Interim Orders are the primary motivation for the majority of OHV enthusiasts visiting the Interim Orders. The trails not closed by the Interim Orders essentially provide a means of access to the "destination" segments closed by the Interim Orders. Absent the ability to ride the closed trail segments, many

if not the vast majority of OHV enthusiasts would have greatly diminished interest in riding in the System.

38.   The Interim Orders indicates that its actions "are categorically excluded from documentation in an environmental impact statement or an environmental assessment."  The Interim Orders further state that these actions "are not subject to legal notice and opportunity to comment" and that the Interim Order(s) "is not subject to [administrative] appeal."

39.   On May 22, 2008, Plaintiffs filed suit (Case No. 08: CV-11) in this Court seeking judicial review of the Interim Orders, complaining of, among other things, the lack of public involvement prior to issuance of the Interim Orders and the inability to submit public comment.

40.   In June, 2008, the Forest released a proposal "for long-term management of the System" and received about 1,500 comments on the proposal.

41.    The lawsuit was dismissed by stipulation dated October 20, 2008.   The stipulation referred to "the Forest Service's stated intention to complete a public planning process and announce a new decision in the near future which will likely substantially impact or change the interim orders referenced in the complaint…."  Stipulation at pp. 1-2; Case No. CV-08-11 (D. WDNC) (Doc. No. 40).

42.   On February 27, 2009, the Forest released an Environmental Assessment ("EA") analyzing six alternatives for management of the System.   Alternative B represented the "proposed action" that was outlined in the June, 2008, proposal.   On the same day, Forest Supervisor Marisue Hilliard issued a letter.   The letter generally announced release of the EA, provided background and information about submitting comments.   In addition, the letter took the unusual step of announcing that "my preferred alternative is Alternative C, which closes the OHV System."   The letter thus proposes another "temporary closure" of the System "for

COMPLAINT -- 12

resource protection, effective April 1, 2009." The letter clarifies that "the impacts to water quality are so significant that I cannot recommend keeping the System open at this time." The letter further states "[t]he Agency is in violation of North Carolina state water quality standards because of the conditions on the Upper Tellico OHV System." However, the letter assured "that a final decision has not yet been made."

43.     Consistent with the letter, and the day following close of the 30-day public comment period on the EA, the Forest Supervisor issued another interim order and decision memo on March 31, 2009.

44.     Plaintiffs and other members of the public submitted comments to the EA during the applicable 30 day period. On October 14, 2009, the Forest released the DN/FONSI and final EA.

45.     Plaintiffs, and other commenters, filed administrative appeal(s) from the DN/FONSI and EA. Those appeals were denied by written decision dated January 15, 2010.

46.     The System, through the "interim" orders and now the DN/FONSI, has effectively been closed to motorized travel since December, 2007.

47.     In addition to the long-standing closure of the System, the Forest recently took additional steps to permanently eliminate many long-existing roads/trails in or near the System. The Forest posted an electronic solicitation, on the Federal Business Opportunities website. *See*, https://www.fbo.gov/index?s=opportunity&mode=form&tab=core&id=cfd79408834a3f9953aef b06b3300338. (Solicitation No. AG-4419-S-10-0581). The solicitation was posted on April 19, 2010, and announced a site visit for interested bidders to be held on April 28, 2010. The solicitation has been amended on three occasions, on May 3, 4, and 5, 2010.

COMPLAINT -- 13

48. Plaintiffs bring this action to challenge the closure of the System to motorized travel, through the Interim Orders and/or DN/FONSI. Plaintiffs additionally challenge the ground-disturbing closure activities outlined in the Solicitation.

## COUNT ONE: VIOLATION OF NEPA
### (Failure to Analyze Action Involving Potential Significant Effects)

49. Plaintiffs hereby incorporate by reference each statement and allegation previously made.

50. The actions proposed under the Solicitation are to be performed within the direction and control of the Forest.

51. The actions outlined in the Solicitation present a potential for significant effects to the human environment. Substantial ground-disturbance is proposed to alter the slope and other aspects of the affected road prism and surrounding System. The location, timing and nature of culvert removal and associated activities caused significant amounts of erosion, soil loss and/or sediment loading of tributaries in the watershed.

52. Regardless of the legality or logic behind eliminating motorized travel on the System, the Forest has never, through the Interim Orders, Second Interim Orders, EA or any other process, evaluated nonmotorized recreational use of the routes in the System or the connection of the same to related uses in other areas of the Forest.

53. Neither the predecisional EA, final EA, nor any other analysis reasonably disclose or analyze the specific activities, locations, or methods of decommissioning.

54. These actions and resultant impacts represent violations of NEPA and other applicable law.

55. Defendants' actions described above are made reviewable through the APA and are arbitrary, capricious, or otherwise not in accordance with law; contrary to constitutional right,

COMPLAINT -- 14

power, privilege or immunity; in excess of statutory jurisdiction, authority, or limitations; without observance of procedure required by law; or otherwise in violation of the APA, 5 U.S.C. § 706 (2), and should therefore be declared unlawful and set aside by this Court.

56.     Plaintiffs have exhausted all administrative remedies required by law in order to seek relief from Defendants' actions addressed in this claim for relief.

57.     Plaintiffs have suffered, and will continue to suffer, harm and injury to their legal interests arising from and associated with their use and enjoyment of the Forest as a result of the allegations contained in this claim for relief, and these injuries will go unredressed absent judicial relief.

## COUNT TWO: VIOLATION OF NEPA
### (Failure to Prepare EIS)

58.     Plaintiffs hereby incorporate by reference each statement and allegation previously made.

59.     NEPA requires a federal agency to prepare an EIS for all major federal actions that "may significantly affect the quality of the human environment." 42 U.S.C. § 4332(2)(C).

60.     An EIS must be prepared if there are substantial questions raised about the possibility of significant impacts to some human environmental factor. Against such asserted impacts, an agency must provide a convincing statement of reasons to justify proceeding through the less-stringent EA analysis. It is not sufficient to merely assert the action will have an insignificant effect.

61.     The requirement to conduct an EIS for possible significant impacts applies to both beneficial and adverse impacts. Thus, "[a] significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial." 40 C.F.R. § 1508.27(b)(1).

COMPLAINT -- 15

62.     The action alternatives outlined in the EA, specifically including the selected alternative, presented at least the possibility of significant effects to the human environment, and thus required preparation of an EIS.

63.     The DN/FONSI illegally concluded that the selected actions did not present the possibility of significant effects to the human environment.

64.     Defendants' actions described above are made reviewable through the APA and are arbitrary, capricious, or otherwise not in accordance with law; contrary to constitutional right, power, privilege or immunity; in excess of statutory jurisdiction, authority, or limitations; without observance of procedure required by law; or otherwise in violation of the APA, 5 U.S.C. § 706 (2), and should therefore be declared unlawful and set aside by this Court.

65.     Plaintiffs have exhausted all administrative remedies required by law in order to seek relief from Defendants' actions addressed in this claim for relief.

66.     Plaintiffs have suffered, and will continue to suffer, harm and injury to their legal interests arising from and associated with their use and enjoyment of the Forest as a result of the allegations contained in this claim for relief, and these injuries will go unredressed absent judicial relief.

## COUNT THREE: VIOLATION OF NEPA
### (Failure to Meaningfully Consider Alternatives to Closure)

67.     Plaintiffs hereby incorporate by reference each statement and allegation previously made.

68.     NEPA requires "that environmental information is available to public officials and citizens before decisions are made and before actions are taken."  40 C.F.R. § 1500.1.

COMPLAINT -- 16

69.     Where an agency is performing NEPA analysis, it may not take action concerning the proposal under consideration which will limit or foreclose reasonable alternatives still under review, or prejudice the outcome of the project.

67.     The Forest conducted only minimal analysis, which did not meaningfully include the public, before deciding to close the System to vehicle travel in December, 2007.

68.     Subsequent analyses have not legitimately considered alternatives other than leaving the System closed to vehicle travel.

69.     The extent of the agency's unwillingness to consider options to closure of the System is revealed by many developments in the planning process, including, but not limited to, solicitation and/or release of relevant data only after close of public comment on the EA and misrepresentation of, failure to cite or meaningfully consider scientific research within the Forest's possession but contradictory to the Forest's premise that water quality adjacent to the System was uniquely impaired.  Whether these or related behaviors rise to the level of bad faith may be relevant to this claim and this action, and Plaintiffs disclose the possibility of seeking discovery to determine whether a basis exists for such claims.

70.     Defendants' actions described above are made reviewable through the APA and are arbitrary, capricious, or otherwise not in accordance with law; contrary to constitutional right, power, privilege or immunity; in excess of statutory jurisdiction, authority, or limitations; without observance of procedure required by law; short of statutory right; or otherwise in violation of the APA, 5 U.S.C. § 706 (2), and should therefore be declared unlawful and set aside by this Court.

71.     Plaintiffs have exhausted all administrative remedies required by law in order to seek relief from Defendants' actions addressed in this claim for relief.

COMPLAINT -- 17

72.     Plaintiffs have suffered, and will continue to suffer, harm and injury to their legal interests arising from and associated with their use and enjoyment of the Forest as a result of the allegations contained in this claim for relief, and these injuries will go unredressed absent judicial relief.

## COUNT FOUR: VIOLATION OF NEPA
### (Procedural Deficiencies in Technical Analysis)

73.     Plaintiffs hereby incorporate by reference each statement and allegation previously made.

74.     In applying NEPA "[a]gencies shall insure the professional integrity, including the scientific integrity, of the discussions and analyses in environmental impacts statements." 40 C.F.R. § 1502.24.   This includes a requirement that agencies disclose the scientific methodologies used, references relied upon, and any hard data from scientific or technical analysis. *Id.*

75.     The EA in many instances fails to present the required information, relying instead upon conclusory and undocumented narrative for propositions central to decision elements.  Specifically, by way of illustration but not limitation, monitoring data from 1994 to 2006 is cited, but not provided.  Final EA at 187-192 (predecisional EA at 65).  Additionally, the DN/FONSI and Final EA make frequent reference to a North Carolina Division of Environment and Natural Resources ("NCDENR") "benthic macroinvertebrate special study" that was performed in April, 2009.  This research, despite being relied on by the DN/FONSI, was not performed until after the close of public comment and was therefore not available for public review and comment.

76.     During the EA process Defendants became aware of research specifically studying macroninvertebrate populations in relevant watersheds.  In fact, Defendants were not

COMPLAINT -- 18

only aware of, but had input regarding design and conduct of, this research. The results were released in approximately April, 2009, and found, in part, that one could not properly draw conclusions between OHV activity and impacts on the macroinvertebrate community. Agency notes refer to this research as a study to be careful of, and the EA only cursorily and inaccurately discusses this study, and fails to include it as a cited reference.

77. Within two weeks of the release of the aforementioned research, the Forest contacted NCDENR to conduct additional research, which though completed after the close of public comment was still cited on numerous occasions in alleged support of the DN/FONSI and closure of the System to motorized travel. Even so, the NCDENR research determined that the relevant water bodies, including those adjacent to the System, displayed "excellent" bioclassification ratings based on survey of the macroinvertebrate community.

78. The public was deprived of the ability to meaningfully comment upon a variety of technical information based on the nature and timing of Defendants' actions and omissions.

79. Defendants' actions and omissions described above are made reviewable through the APA and are arbitrary, capricious, or otherwise not in accordance with law; contrary to constitutional right, power, privilege or immunity; in excess of statutory jurisdiction, authority, or limitations; without observance of procedure required by law; short of statutory right; or otherwise in violation of the APA, 5 U.S.C. § 706 (2), and should therefore be declared unlawful and set aside by this Court.

80. Plaintiffs have exhausted all administrative remedies required by law in order to seek relief from Defendants' actions addressed in this claim for relief.

81. Plaintiffs have suffered, and will continue to suffer, harm and injury to their legal interests arising from and associated with their use and enjoyment of the Forest as a result of the

COMPLAINT -- 19

allegations contained in this claim for relief, and these injuries will go unredressed absent judicial relief.

**COUNT FIVE: VIOLATION OF NEPA**
**(Illegal Conclusions in Technical Analysis)**

82.     Plaintiffs hereby incorporate by reference each statement and allegation previously made.

83.     Defendants' actions here ultimately hinge on the conclusion that the Tellico River demonstrates illegally high turbidity readings, and that such condition(s) is causally-related to OHV travel within the System.

84.     Defendants similarly conclude that environmental factors, including water quality, and wildlife communities including macroinvertebrates and fish, are suffering adverse impacts within or adjacent to the System and that such adverse impacts are causally connected to continuing motorized travel within the System.

85.     Defendants' conclusions are not defensible under even deferential review.   In numerous regards, Defendants' technical conclusions fail applicable standards of review, including those related to, by way of illustration but not limitation, reference watersheds, sedimentation, aquatic impacts, fisheries biology, and macroinvertebrate populations.

86.     In framing their analysis and reaching the aforementioned conclusions, Defendants incorrectly interpreted applicable state and federal law and regulation regarding water quality.

87.     Defendants' actions described above are made reviewable through the APA and are arbitrary, capricious, or otherwise not in accordance with law; contrary to constitutional right, power, privilege or immunity; in excess of statutory jurisdiction, authority, or limitations; without observance of procedure required by law; short of statutory right; or otherwise in

COMPLAINT -- 20

violation of the APA, 5 U.S.C. § 706 (2), and should therefore be declared unlawful and set aside by this Court.

88. Plaintiffs have exhausted all administrative remedies required by law in order to seek relief from Defendants' actions addressed in this claim for relief.

89. Plaintiffs have suffered, and will continue to suffer, harm and injury to their legal interests arising from and associated with their use and enjoyment of the Forest as a result of the allegations contained in this claim for relief, and these injuries will go unredressed absent judicial relief.

## COUNT SIX: VIOLATION OF NEPA
### (Inadequate Range of Alternatives)

90. Plaintiffs hereby incorporate by reference each statement and allegation previously made.

91. NEPA imposes a mandatory procedural duty on federal agencies to consider a reasonable range of alternatives in an EIS. 40 C.F.R. § 1502.14. The alternatives section is considered the "heart" of an EIS. *Id.* A NEPA analysis is invalidated by the existence of a viable but unexamined alternative.

92. The Forest excluded or failed to meaningfully consider viable alternatives from the range of alternatives analyzed in detail and made available to public comment in the EA. In particular, no alternative was considered which would have required active and effective recreation management, as the Forest was intent on simply closing the System and eliminating associated vehicle use and any need to manage the same.

93. Defendants' actions described above are made reviewable through the APA and are arbitrary, capricious, or otherwise not in accordance with law; contrary to constitutional right, power, privilege or immunity; in excess of statutory jurisdiction, authority, or limitations;

COMPLAINT -- 21

without observance of procedure required by law; or otherwise in violation of the APA, 5 U.S.C. § 706 (2), and should therefore be declared unlawful and set aside by this Court.

94.     Plaintiffs have exhausted all administrative remedies required by law in order to seek relief from Defendants' actions addressed in this claim for relief.

95.     Plaintiffs have suffered, and will continue to suffer, harm and injury to their legal interests arising from and associated with their use and enjoyment of the Forest as a result of the allegations contained in this claim for relief, and these injuries will go unredressed absent judicial relief.

## COUNT SEVEN: VIOLATION OF NFMA-TRAVEL MANAGEMENT RULE
### (Illegal Application of Substantive Criteria)

96.     Plaintiffs hereby incorporate by reference each statement and allegation previously made.

97.     The DN/FONSI contain numerous prohibitions and restrictions on motorized vehicle which either fail to acknowledge or rationally apply the Travel Management Rule criteria.

98.     Defendants' actions described above are made reviewable through the APA and are arbitrary, capricious, or otherwise not in accordance with law; contrary to constitutional right, power, privilege or immunity; in excess of statutory jurisdiction, authority, or limitations; without observance of procedure required by law; short of statutory right; or otherwise in violation of the APA, 5 U.S.C. § 706 (2), and should therefore be declared unlawful and set aside by this Court.

99.     Plaintiffs have exhausted all administrative remedies required by law in order to seek relief from Defendants' actions addressed in this claim for relief.

COMPLAINT -- 22

100. Plaintiffs have suffered, and will continue to suffer, harm and injury to their legal interests arising from and associated with their use and enjoyment of the Forest as a result of the allegations contained in this claim for relief, and these injuries will go unredressed absent judicial relief.

## REQUEST FOR RELIEF

Wherefore, having alleged violations of the Travel Management Rule, NFMA and its implementing regulations, NEPA and its implementing regulations, and the APA, Plaintiffs respectfully request judgment in their favor on each and every claim alleged herein, and request that the Court rule, adjudge, and grant relief as follows:

1. Declare unlawful and set aside the Interim Orders, Second Interim Orders and/or DN/FONSI and associated EA(s);

2. Remand the matters addressed in the Interim Orders, Second Interim Orders, EA(s) and DN/FONSI for further analysis and action in accordance with applicable law;

3. Award injunctive relief, possibly including preliminary injunctive relief, as may be determined appropriate in subsequent proceedings;

4. Award the Plaintiffs their reasonable fees, costs, and expenses of litigation as allowed by the Equal Access to Justice Act, 28 U.S.C. § 241 *et seq.* and other applicable law or rule of court; and

5. Grant such further and additional relief as the Court deems just and proper.

COMPLAINT -- 23

Respectfully submitted this 18th day of May, 2010.


                              YORK WILLIAMS & LEWIS, LLP


                              /s/ David M. Harmon
                              David M. Harmon
                              NC Bar No. 28395
                              York Williams & Lewis, LLP
                              P.O. Box 36858
                              Charlotte, NC 28236
                              Tel:  704-375-4480
                              Fax: 704-375-6895
                              dharmon@yorkwilliamslaw.com
                              *Of Attorneys for Plaintiffs*