# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION
### CIVIL ACTION NO. 2:10CV15

SOUTHERN FOUR WHEEL DRIVE
ASSOCIATION, UNITED FOUR
WHEEL DRIVE ASSOCIATION,
THE BLUE RIBBON COALITION,
INC.,

        **Plaintiffs,**

    **v.**

UNITED STATES FOREST
SERVICE, NANTAHALA
NATIONAL FOREST, MARISUE
HILLIARD, Forest Supervisor,

        **Defendants,**

TROUT UNLIMITED, PUBLIC
EMPLOYEES FOR
ENVIRONMENTAL
RESPONSIBILITY, WILD SOUTH,

        **Intervenor-Defendants**

## INTERVENOR'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Plaintiffs (the "ORV Clubs") challenge decisions by the Defendants (the "Forest Service") closing, first on an interim basis and then permanently, the degraded Tellico Off Road Vehicle ("ORV") Area in the watershed of the Tellico River, an important brook trout habitat. The ORV Clubs contend that the Forest Service was determined to achieve that outcome and ignored viable alternatives.

1

To the contrary, the Administrative Record tells the story of an ongoing effort to protect water quality that, over time, revealed mounting evidence compelling one, inescapable conclusion: the watershed of the Tellico River and its headwater streams is a uniquely unsuitable location for motorized ORV trails.

Federal law is clear that protection of water quality and fish habitat is of paramount concern. Because the Forest Service found that ORV trails were degrading water quality, it was compelled by the Clean Water Act, the National Forest Management Act, and its own Travel Management Rule to close the Tellico ORV Area. Agency action compelled by law is not arbitrary and capricious. Furthermore, the Administrative Record more than satisfies the Forest Service's obligations under the National Environmental Policy Act and the ORV Clubs' procedural challenges fail as a matter of law.

## I.     FACTS

### The Tellico River

The Tellico River and its headwaters (the "Tellico trout waters") are important trout habitat. The Tellico River originates in the Nantahala National Forest in North Carolina and flows into Tennessee. (Administrative Record "AR" 10643) Because 75% of the watershed is publicly owned (AR 741), it is largely insulated from pressures that threaten streams on private land. North Carolina and

2

Tennessee classify the Tellico trout waters as wild trout habitat. (AR 10667-68) Trout are highly sensitive to sedimentation and turbidity. (AR 741, 743)

The Tellico watershed receives more than 80 inches of rain a year, with the rainiest months occurring from December to March. (AR 10655) Soils in the watershed are classified by the Natural Resources Conservation Service as a "severe" erosion hazard and "poorly suited" for dirt roads. (AR 10669)

### The Tellico Orv Area

The Tellico Off-Road Vehicle ("ORV") Area is a network of approximately 40 miles of ORV trails located in Tellico River watershed.[1] (AR 10643) The ORV trails intertwine with and cross streams that form the headwaters of the Tellico River. (See AR 10544 and trail map at AR 20205)

The trails are based on old logging roads constructed by private owners half a century ago. (AR 404) Many of the routes were badly sited and engineered with steep slopes and poor drainage such that they do not meet current industry standards. (AR 404, 10666) The vast majority (85%) of these old roads are surfaced with bare soil. (AR 10670, 10672)

The Forest Service acquired the Tellico area in 1980, by which time ORV riders had been using the abandoned logging roads for forty years. (AR 265) The

---

[1] The Administrative Record contains extensive photo collections of Trails 2, 4, 5, 6, 7, 8, 9, 11, and 12 illustrating the management challenges presented by the Tellico ORV Area. (See e.g., AR 1924, 1190, 1936, 1940, 2307, 2374, 2375, 1735, 1658, 1058, 901, 1186, 190, 194, 1235, 2003, 1250, 1808, 1647, 2235, 1817, 1378, 1383, 1418, 1564).

3

Forest Service maintained 12 numbered trails in the area open to ORVs. (AR 10783, 20205) The Tellico trails include "high challenge" areas featuring boulders and bedrock exposed by erosion and passable only by highly-specialized 4WD rock crawlers. (AR 10783) Erosion on poorly designed and maintained trails creates greater "challenge" by exposing more boulders and bedrock, making them popular with recreational ORV riders and subjecting them to even greater ORV traffic. (AR 10678) Greater traffic means more disturbance of trail surfaces and greater erosion. (AR 10678) As trails eroded, and challenge areas became more challenging, Tellico became a more popular ORV destination. (AR 10783, Compl. at ¶ 21). The popularity of the area grew much faster than the Forest Service expected with a 153% increase in usage between 1997 and 2003, and 1,411 vehicles a month using the system by 2007. (AR 265)

### The Multi-year Effort to Stop Erosion from the Tellico ORV Area

Beginning in the 1990s, the Forest Service hosted annual meetings reporting on the status of the Tellico watershed to Trout Unlimited and the ORV Clubs. (AR 265) As evidence of excessive erosion mounted, the Forest Service conducted its first comprehensive assessment of the area in 2005. (AR 402, 263) The Assessment revealed that the Tellico ORV trails had deteriorated "to the point that regular road/trail BMPs [Best Management Practices] are no longer adequate" (AR 418) and that existing measures were ineffective and "under designed." (AR 418)

4

Sediment monitoring data collected since 1998 demonstrated that "the ORV trail network has increased erosion and sediment yield to stream channels in the Upper Tellico River watershed often by an order of magnitude." (AR 417) The assessment noted that overall trout densities were lower in the Tellico River watershed than in comparable areas (AR 435) but concluded that there existed a "knowledge gap" that needed to be filled about the impact of the accelerated erosion on aquatic communities. (AR 418-19)

The "knowledge gap" identified in the 2005 Assessment was filled in 2007 when the North Carolina Wildlife Resources Commission ("WRC") released a report summarizing eleven years of fish monitoring in the Tellico trout waters. (AR 740) The WRC report documented adverse impacts to trout in their early life stages. (AR 740) Alarmingly, between 2003 and 2006, surveys at several locations found no "year-0," or newly spawned, trout. (AR 740, 743) Sampling sites at higher elevations, and more removed from ORV trail impacts, fared better than sites downstream of ORV trails. (AR 743-44) The report noted that "inputs of sediment can have a detrimental influence on trout reproductive success and early life history survival." (AR 743) The report concluded, ominously, that "reproductive failures at the Tellico River sites heighten the risk of losing the trout populations from those sections entirely." (AR 745) To confirm the causes of that

trend, the WRC recommended further study "to include measurements of sediment loading (sources, rates, and timing) and other water quality parameters." (AR 745)

Alarmed by this threat to the viability of trout populations, Intervenors met with the Forest Service on June 21, 2007 to request immediate remedial action. (AR 773) Having received no assurances at that time that the Forest Service would take meaningful steps to prevent further degradation, Intervenors notified the agency on June 28, 2007 that they intended to sue for violations of multiple laws. (AR 776)  No lawsuit was filed.

In the months that followed, the Forest Service took steps to identify the causes of aquatic degradation in the Tellico trout waters by measuring sediment loading, sources, rates and timing, as recommended by the WRC report.  The agency adopted a plan to monitor sediment levels in the water (AR 2116, 6188), measure sediment deposits in stream beds (AR 2117, 6189), and assess aquatic macroinvertebrates (AR 2121).   The Forest Service also initiated trail condition surveys, by a team of fourteen Forest Service staff with engineering, fisheries, hydrology, and GPS experience. (AR 2051, 2041) The assessment team "surveyed, measured and photographed every feature in the system" and "measured movement of sediment from about 2,000 data points."  (AR 6175, 2043)  The survey team focused its immediate efforts in fall of 2007 on 16.6 miles of trails identified as high risk for sedimentation. (AR 2149)

The combined results of this work informed a December 18, 2007 Forest Supervisor Order (the "Remedial Closure Order"), closing for one-year several degraded ORV trails (Trails 7, 8, 9 and Lower 2)  and closing seasonally the entire ORV area during the rainy winter months.  (AR 2148)  Surveys of high-risk ORV trails found that only 61% of erosion control features were functioning and "[a]ll trail segments assessed were contributing sediment to nearby streams to some degree."  (AR 2149)  A computer model projected that, absent immediate action, the surveyed trails would continue to send 622,000 pounds of sediment to streams each year.  (AR 2027) The Forest Supervisor explained that the closures were "needed to correct ongoing impacts to area waters and aquatic resources caused by sediment from the Upper Tellico road and trail system."  (AR 2149)

With the Remedial Closure Order in place, the Forest Service contracted for stabilization and maintenance of ORV trails (AR 2595, 2480, 2597) and continued its trail condition surveys and evaluation of options for the Tellico ORV area.

That ongoing evaluation culminated in a Forest Service proposal designed to reduce sediment discharged from the trail system while keeping the ORV trails open.  (AR 02824) The Forest Service proposed to reduce the size from the trail system from 39.5 to 24 miles. (AR 02831) A June 9, 2008 scoping notice, which invited public comment on the proposal, explained that alternative proposals for management of the ORV area would be assessed in light of the agency's need to

7

prevent "additional visible sediment" from reaching the Tellico trout waters and to avoid "excessive maintenance and reconstruction costs." (AR 02831)  Because the mandate to meet water quality standards would require more maintenance, the notice advised, the Forest Service would have to find substantial additional resources or reduce the maintenance burden.  (AR 2832)

Those criteria informed a draft Environmental Assessment ("EA") released by in February 2009  that evaluated six alternatives for the ORV Area, ranging from creation of new trails to total closure.  (AR 5495-501).  Because "impacts to water quality [were] so significant," the Forest Supervisor indicated she "cannot recommend keeping the System open at this time" and that her "preferred alternative" was Alternative C, closure of the trails to ORV travel.    (AR 5700)

Concurrent with the draft EA, the Forest Supervisor invited comments on a new temporary closure of the Tellico ORV area (the "Interim Closure Order"). (AR 5699)  That Interim Closure Order subsequently was issued on March 31, 2009 "to implement immediate resource protection measures" while allowing time to review public comment on the draft EA. (AR 6300)

Before the Forest Service released its final decision on the management of the Tellico ORV area, the ORV Clubs filed litigation in this court (Case No. 2:08-cv-11-LHT) challenging the Interim Closure Order.  The ORV Clubs subsequently dismissed the case voluntarily. (Case No. 2:08-cv-11-LHT, Doc. No. 40)

8

Finally, in October 2009, the Forest Service issued its final Environmental Assessment and Decision Notice (the "Final Closure Order") for the Tellico ORV Area. (AR 10639-10877, 10614-10629) In addition to the six alternatives identified by the draft EA, the Forest Service reviewed a "Caliber Alternative," developed by a contractor for the ORV Clubs, with recommendations the Forest Service found to be duplicative of existing alternatives or technically unworkable. (AR 10659, 9812, 2316) The Forest Service also reviewed, a "Trails Unlimited Alternative" developed by an internal Forest Service group that visited the Tellico ORV area for only two days. The Forest Service rejected those recommendations, based on its own multi-month trail survey, as infeasible from an engineering perspective and because Trails Unlimited underestimated rehabilitation costs. (AR 10660-61, 2613, 10864) The final EA also analyzed a modification of Alternative F, which would enlarge the Tellico ORV area to 44.5 trail miles. (AR 10657)

The Final Closure Order adopted Alternative C, closure of the entire Tellico ORV Area to ORV travel. (AR 10614) Based on the extensive Administrative Record, the Forest Service concluded:

- Forest Plan standards for soil and water were being violated. Surveys documented 1,889 sources of "visible sediment" leaving trails, with one third extending all the way to streams. (AR 10644) More than 12 miles of trail had direct hydrological connections to streams and even trails with limited

9

connectivity could send "inordinate amounts of sediment" to streams. (AR 10680-81)

- Best Management Practices (structures like sediment traps, culverts and water diversion bars designed to prevent or capture erosion) were failing. Less than half of the 2,000 erosion control features surveyed were working properly. (AR 10644) More than 75,000 tons of soil eroded from the trails in past years. (AR 10645, 11673) The popular "high challenge" areas in the system "have lost all soil and are eroded to bedrock and boulders, while sidewalls of the entrenched areas continue to erode." (AR 10669)

- The North Carolina turbidity standard (10 NTUs) was being violated with turbidity as high as 370 NTUs documented in affected streams and unacceptable turbidity documented in all streams surveyed. (AR 10645) Streams impacted by the ORV area had more turbidity than unaffected reference streams. (AR 10683-84) Streams passing through the ORV area had more turbidity at sites downstream of the ORV area than upstream. (AR 10683)

- Streambeds affected by the ORV area had heavy loads of "fine sediment" as compared to unaffected reference streams. (AR 10685-10689) Fine sediment deposits were impeding reproduction of brook trout. (AR 10645-46, 10712)

10

- The ORV Trails system violated Forest Plan standards for trail density and level of challenge. (AR 10646)

- Best management practices were not sustainable in the area. Heavy rainfall and highly-erodible, "severe hazard" soils make the area unsuitable for dirt-surfaced roadways. (AR 10645, 10668-69) Because the trails were not engineered to modern standards, modern erosion controls did not work on them. (AR 10674) Some erosion control measures on the trails, like sediment traps, are under-designed, but cannot be expanded because of proximity to streams or steep slopes. (AR 10676) Trails entrenched by past erosion are completely unsuitable to conventional water diversion measures. (AR 10645) Trails that have eroded to bedrock have exposed underground streams that run down the trail surface, accelerating erosion. (AR 10677) Even erosion control features recently rebuilt under the 2008 stabilization contract proved to be only 49% effective at keeping sediment out of streams. (AR 10679) Because of these inherent limitations, Alternative C was the only Alternative under consideration determined to present a "high" likelihood of meeting state federal standards through successful best management practices. (AR 10690)

- Meeting water quality standards while maintaining ORV access would be prohibitively expensive, requiring special road designs, major reconstruction, many more erosion control structures and very frequent maintenance (four

11

times a year for most structures and twelve times a year for trails within 100 feet of streams). (AR 10675-10676, 10690) Alternative C, which would require fewer erosion control structures and maintenance only once per year, would have a one-time capital cost of $2.3 million and a net operating cost of only $218,784 annually. (AR 10867, 10824) The second most affordable alternative (Alt. D-modified) required a $3.1 million capital outlay and an annual cost of $587,611. Id. The most expensive (Alt. F-modified) required $6.2 million in capital costs and $1.5 million to operate the system annually. Id. In 2007, the Forest Service was appropriated only $2.2 million for road and trail maintenance of the entire National Forest System in North Carolina (including the Pisgah, Nantahala, Uwharrie and Croatan National Forests). (AR 10597)

- Some areas could not be maintained even if resources were available. During the 2008 stabilization and maintenance contract, a Forest Service contractor refused to work on Trail 12 within the Tellico ORV area because its grade and deep entrenchment made it unsafe for workers. (AR 2841)

Under Alternative C, these problems would be addressed by closing the entire ORV area to ORV traffic, reengineering approximately 13.4 miles of trails into forest roads for street-legal vehicles, and stabilizing and recontouring other closed trails to prevent further erosion. (AR 10653) In this litigation, the ORV Clubs allege the Forest Service acted arbitrarily and capriciously by choosing

12

Alternative C and that its decision process violated procedural requirements of the

National Environmental Policy Act.[2]

## II.    <u>STANDARD OF REVIEW</u>

Summary judgment is proper when there is no genuine issue of material fact

and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56

(c). The court must ascertain "whether the evidence presents sufficient

disagreement to require submission to a jury or whether it is so one-sided that one

party must prevail as to a matter of law." <u>Anderson v. Liberty Lobby, Inc.</u>, 477

U.S. 242, 251-52 (1986). The moving party bears the burden of showing the court

that there are no genuine issues of material fact, <u>Celotex Corp. v. Catrett</u>, 477 U.S.

317, 325 (1986). To avoid summary judgment, the non-moving party must

demonstrate the existence of "evidence from which a jury might return a verdict in

his favor." <u>Anderson</u>, 477 U.S. at 257.

The Administrative Procedures Act (APA) defines the scope of review for

federal agency decisions, requiring that a federal agency's action be set aside if it is

---

[2] The ORV Clubs' complaint suggests that they also challenge the Remedial and Interim Closure Orders. Complaint at ¶ 2 (Dkt # 1). Any challenge to those orders is now moot because they were effective for a limited time that has now expired (AR 2141, 6297) and because they have been superseded by the Final Closure Order (AR 10614-15). This Court lacks jurisdiction "to declare principles or rules of law which cannot affect the matter in issue in the case before it." <u>Church of Scientology v. United States</u>, 506 U.S. 9 (1992) (citations omitted). Because an expired or superseded agency action is complete and beyond the powers of this Court to affect, challenges to such orders are moot and must be dismissed. See <u>Gulf of Maine Fishermen's Alliance v. Daley</u>, 292 F.3d 84, 88 (1st Cir. 2002) (challenge to  closure of area to fishing was moot where regulation was "no longer in effect because it has been replaced by a series of subsequent" regulations); <u>Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.</u>, 460 F.3d 13, 18 (D.C. Cir. 2006) (NEPA claim moot because agency memorandum was "short-term, temporary" action that had expired); <u>Am. Rivers v. Nat'l Marine Fisheries Serv.</u>, 126 F.3d 1118, 1123-24 (9th Cir. 1997) (similar); <u>Aluminum Co. of Am. v. Bonneville Power Admin.</u>, 56 F.3d 1075, 1078 (9th Cir. 1995) (similar).

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C.A. § 706(2)(A). Review of agency action under the APA is limited to the administrative record that was available to the agency at the time of its decision. VA v. Browner, 80 F.3d 869, 875 (4th Cir. 1996).

When an agency's decision not to prepare an EIS is challenged, the decision is reviewable under the "arbitrary and capricious" standard of the APA, since it is a fact-based decision which relies on agency expertise. Providence Rd. Cmty. Ass'n v. EPA, 683 F.2d 80 (4th Cir. 1982); Society Hill Towers Owners' Ass'n v. Rendell, 210 F.3d 168, (3d Cir. 2000). The court must confirm that the agency took a "hard look" at an action's environmental impacts. Hughes River Watershed Conservancy v. Glickman, 81 F.3d 437, 443 (4th Cir. 1996). However, "[c]ourts may not 'flyspeck' an agency's environmental analysis." Nat'l Audubon Soc'y v. Dep't of the Navy, 422 F.3d 174, 185 (4th Cir. 2005). The court must defer to the decision unless "there has been a clear error of judgment." Hodges v. Abraham, 300 F.3d 432 (4th Cir. 2002).

## III.   ARGUMENT

The Forest Service was obligated by multiple laws to take immediate action to stop the degraded Tellico ORV trails from causing further resource damage. Every step of this long administrative process revealed new information confirming the extensive resource damage caused by the degraded Tellico ORV

trails, ultimately compelling the conclusion that the Tellico-River watershed is unsuitable for ORVs.

The ORV trails are improperly sited and inadequately engineered across unstable soils and slopes. Decades of poor maintenance caused severe degradation that has damaged a high priority watershed and trout habitat. Remedying the problems would be prohibitively expensive. For all these reasons, the Forest Service concluded that the Tellico ORV system could not be sustained while meeting the agency's multiple legal mandates to protect soils, watersheds and aquatic life from degradation. Because the Forest Service's multi-year evaluation of the Tellico ORV area was both thorough and public and because the agency's ultimate decision to close the ORV trails was compelled multiple legal mandates, the ORV Clubs' challenge to that decision fail as a matter of law.

## A. The Forest Service Was Required by Law to Close the Degraded Tellico ORV Trails.

The Forest Supervisor's Remedial and Interim Closure Orders figure prominently in the ORV Clubs' theory of their case. The ORV Clubs' argue that the "Forest Service illegally committed to closing the System before engaging the public" and that the "Interim Orders cemented a legacy of closure." (Pl.'s Mem. Supp. Mot. Summ. J. ("Pl. Summ. J.") 2 (Dkt. # 33)). As a result, the ORV Clubs allege, the Forest Service failed "legitimately" to consider alternatives to closure (Compl. at 16-17, Count 3), conducted deficient technical analysis (Compl. at 18,

15

Count 4), incorrectly applied state and federal laws to reach illegal technical conclusions in their analysis (Compl. at 20, Count 5), considered an inadequate range of alternatives because the agency "was intent on simply closing the System," (Compl. at 21, Count 6), and failed to apply the legal standards of the agency's own Travel Management Rule (Compl. at 22, Count 7). As a matter of law, the ORV Clubs claims are meritless.

The Forest Service's closure orders were legally-mandated responses to overwhelming evidence that ORV trails were degrading water quality in the Tellico trout waters, not the product of a predisposition against ORV trails, as suggested by the ORV Clubs.

As a federal agency entrusted with the management of public land, the Forest Service must comply with legal mandates to prevent degradation of soils, water quality and aquatic life. The Forest Service documented severe erosion at the Tellico ORV area due to unstable soils and slopes, badly sited and improperly engineered roadways, and years of inadequate maintenance. The erosion in turn degraded water quality and aquatic habitat, putting the Forest Service in violation of multiple laws, including the federal Clean Water Act, the North Carolina Sedimentation Pollution Control Act, the National Forest Management Act (for violations of the governing Forest Plan), and the Forest Service's own Travel Management Rule. The Forest Service was obligated to take immediate action to

Case 2:10-cv-00015-MR  -DCK   Document 40-1    Filed 08/04/11   Page 16 of 35

arrest the degradation. That obligation prompted the Forest Supervisor's Remedial
and Interim Closure Orders while the agency conducted a comprehensive review of
alternative options.

When, after full analysis, the agency concluded that it could not maintain the
Tellico ORV trails adequately to ensure compliance with its legal standards in the
long term, and that only Alternative C had a high probability of meeting state and
federal standards (AR 10690), it had no choice but to permanently close the ORV
area through the Final Closure Order. As an agency action compelled by multiple
legal mandates and supported by an extensive administrative record, the Forest
Supervisor's orders closing the Tellico ORV area are not arbitrary or capricious.

     1.    <u>The Closure Orders Were Mandated by the Clean Water Act</u>.

The Forest Service must comply with all state and federal water quality
laws. The Clean Water Act requires that federal agencies with "jurisdiction over
any property" or engaged in any activity causing "the discharge or runoff of
pollutants" must comply with all state requirements "respecting the control and
abatement of water pollution . . . to the same extent as any nongovernmental entity
. . . ." 33 U.S.C. § 1323(a). Sediment discharged into streams from the severely
degraded trails at the Tellico ORV area placed the Forest Service in violation of
multiple North Carolina water quality laws including the state's Sedimentation
Pollution Control Act's ("SPCA"), which prohibits visible sediment entering

17

streams, and the state's standard for turbidity in trout streams. Because the Forest Service was in violation of North Carolina water quality laws, it was in violation of the federal Clean Water Act and had an immediate obligation to arrest degradation from the Tellico ORV trails.

      a.   <u>The Forest Service Violated the Sedimentation Pollution Control Act Because Visible Sediment from ORV Trails Reached Streams</u>.

The mandatory standards of the Nantahala Forest Plan ("Forest Plan") direct the Forest Service to "[p]revent visible sediment from reaching perennial and intermittent stream channels . . . ." Pisgah-Nantahala National Forest Land Resources Management Plan ("Forest Plan") at III-40 (excerpts at Exhibit A). This forest plan standard is binding on the Forest Service. 16 U.S.C. § 1604 (i). Nonetheless, the ORV Clubs question whether the Forest Service is bound to this standard at all. (<u>See</u> Pl. Summ. J. at 33) Not only is this requirement binding as a standard of the Forest Plan, it originates from and is independently enforceable under the North Sedimentation Pollution Control Act ("SPCA"). See e.g. <u>Pennsylvania Dep't of Envtl. Res. v. United States Postal Serv.</u>, 13 F.3d 62, 65 (3d Cir. 1993) (Clean Water Act renders Postal Service subject to enforcement for violation of state erosion control statute).

The SPCA regulates activities that cause erosion. See <u>State ex rel. Lee v. Penland-Bailey Co.</u>, 274 S.E.2d 348, 351 (N.C. Ct. App. 1981) (SPCA regulates sedimentation itself, not just land-disturbing activities). Under the Act, soil-

disturbing activities must leave a buffer around every stream wide enough to stop

sediment originating outside the buffer before it reaches a stream.  N.C. Gen. Stat.

§113A-57(a).  Furthermore, after development of a site is complete, the land owner

must "install and/or maintain all necessary permanent erosion and sediment control

measures." 15A N.C. Admin. Code 04B .0113; see also, Cox v. State, 344 S.E.2d

808, 809 (N.C. Ct. App. 1986) (developer liable for failure to maintain sediment

controls more than a decade after completion of road system).  As documented by

Forest Service trail surveys, the agency failed to maintain a buffer around streams

sufficient to prevent sediment from reaching streams and failed to maintain

necessary erosion control structures, leaving it in violation of the SPCA.  (AR

10618)

Activities "for the production and harvesting of timber" are exempted from

the SPCA under certain conditions.  N.C. Gen. Stat. § 113A-52.1(b).  That

exemption is inapplicable here, however, because operation of ORV trails is

unrelated to timber production.  Even if the exemption applied, the Forest Service's

failure to comply with "Forest Practice Guidelines Related to Water Quality"

revokes the exemption.  N.C. Gen. Stat. § 113A-52.1(b).

The Forest Practice Guidelines largely follow the requirements of the SPCA

itself.  They require a protective buffer, called a Streamside Management Zone, "of

sufficient width to confine within the zone visible sediment resulting from

19

accelerated erosion."  15A N.C. Admin. Code 01I .0201(a).  When timbering is

complete, the Guidelines require "[t]reatment and maintenance" of disturbed areas

"sufficient to restrain accelerated erosion and <u>prevent visible sediment</u> from

entering intermittent and perennial streams and perennial waterbodies until the site

is permanently stabilized."  15A N.C. Admin. Code 01I .0209 (emphasis added).

The Forest Service documented more than 600 locations where visible sediment

left ORV trails and reached streams and an extensive failure to maintain erosion

controls on the unstabilized Tellico trails.  (AR 10618) These failures to comply

with the Forest Practice Guidelines revoked any possible forestry exemption,

leaving the Forest Service in clear violation of the SPCA, and, as a result, the

Clean Water Act, completey apart from Clean Water Act Violations due to

degradation of water quality or impairment of aquatic habitat.

     Accordingly, the Forest Service was required to take action to stop erosion

from the Tellico ORV trails, to prevent visible sediment from reaching streams, and

to ensure that it could maintain permanent erosion control structures.  It did just

that, first by issuing the Remedial and Interim closure orders to reduce erosion and

then issuing its Final Closure Order when it concluded that it lacked the capacity

meet the SPCA standards in the future. (AR 10644-45)

  b.  <u>The Forest Service Violated North Carolina's Water Quality Standards</u>.

The Forest Service is obligated by the Clean Water Act to comply with state water quality standards. See 33 U.S.C. § 1323. All of the streams affected by the Tellico ORV trail system are designated as Class C Trout waters under North Carolina water quality standards. These standards prohibit turbidity in excess of 10 Nephelometric Turbidity Units (NTUs) in trout waters. 15A N.C. Admin. Code 02B .0211 (3)(k). Furthermore, "if the turbidity exceeds these levels due to natural background conditions, the existing turbidity level cannot be increased." Id (emphasis added). Although, compliance with this turbidity standard can be met when Best Management Practices (BMPs) are employed, the "BMPs must be in full compliance with all specifications governing the proper design, installation, operation and maintenance of such BMPs." Id.

Under North Carolina law, anyone causing a violation of a water quality standard or management practice is subject to a civil penalty. N.C. Gen. Stat. § 143 215.6A(b)(1); see Harris Real Estate Constr. Inc. v. N.C. Div. of Water Quality, 2000 N.C. ENV LEXIS 19 (N.C. Ofc. Admin. Hr'g 2000) (Petitioner violated statutes "by causing the turbidity . . . to exceed the 25 NTU water quality standard").

The Forest Service documented turbidity in streams affected by the Tellico ORV area that exceeded 10 NTUs with levels recorded as high as 370 NTUs and documented violations "in virtually all surveyed streams." (AR 10645) Although

21

background levels sometimes exceeded 10 NTUs during storm events, the Forest Service documented that the Tellico ORV area caused background turbidity levels to be increased further, in violation of the standard. (AR 10683) In particular, Forest Service monitoring confirmed that the ORV area discharged substantial quantities of sediment which, in turn, increased turbidity in streams. For example, turbidity in streams downstream of the ORV trails was greater than reference streams not affected by the ORV area, and turbidity in one reference stream (Tipton Creek) was less at a site above the ORV trail system than at a second monitoring site below the trail system. (AR 10683)

In addition to stricter numerical limits on turbidity, North Carolina's standards for trout waters require "conditions which shall sustain and allow for trout propagation . . . ." 15A N.C. Admin. Code 02B .0202(65). Similarly, Tennesee law prohibits pollution or runoff "that could be injurious to the propagation of fish, or that results in the destruction of habitat for fish and aquatic life." See Tenn. Code. Ann. § 70-4-206. The eleven years of trout population monitoring conducted by the WRC confirmed that the Forest Service was in violation of these standards because sediment from the Tellico ORV trails was adversely affecting propagation of trout. (AR 740, 743-45)

The Forest Service had an absolute obligation under the Clean Water Act to cease activities that caused it to violate North Carolina and Tennessee narrative

water quality standards for propagation of fish and North Carolina's turbidity standard. Notably, the North Carolina Division of Water Quality submitted comments to the Forest Service arguing that Tellico ORV Trails had caused "violations of the surface water quality standards for turbidity" and the Division supported Alternative C and closure of the Tellico ORV trails. (AR 9787)

> 2. The Closure Orders Were Mandated by the Nantahala National Forest Plan and the National Forest Management Act.

In addition to the requirements of the Clean Water Act, the National Forest Management Act and the Forest Plan for the Nantahala National Forest compelled the Forest Service to close the Tellico ORV area.

The National Forest Management Act ("NFMA") requires the Forest Service to develop management plans for each national forest. See 16 U.S.C. § 1604(a). NFMA requires that all "plans and permits . . . shall be consistent with the land management plans." 16 U.S.C. § 1604 (i); see also Northwoods Wilderness Recovery v. United States Forest Serv., 323 F.3d 405, 407 (6th Cir. 2003).

Under the plan, the Forest Service must improve "habitat of wild streams as a first priority." Forest Plan at III-185. In addition, it must "[d]esign, construct, and maintain travel surfaces to meet water quality standards." Forest Plan at III-8. Furthermore, ORV use "will not be allowed to damage the Forest's environment" and must not "adversely affect other resources." Forest Plan at III-57, III-67. Of course, as previously discussed, the plan also requires the Forest Service to

"[p]revent visible sediment from reaching perennial and intermittent stream channels . . . .." Forest Plan at III-40.

The Nantahala National Forest Plan divides the forest into zones, known as management areas, and provides standards for the management of each area. In the management areas that include the Tellico ORV area, the Forest Plan directs the Forest Service to operate ORV trails that "provide easy to moderate levels of challenge," Forest Plan at III-11, up to a maximum density of "2 miles per square mile in any management area unit." See Forest Plan at III-59, III-67. In those management areas, ORV trails must "protect water quality." Forest Plan at III-62, III-70. The Forest Plan sets even more stringent standards for areas within 100 feet of streams, classified as Management Area 18 under the plan. In such areas, the Forest Service is required to "[r]ehabilitate active sites that are contributing visible sediment to the stream channel" and "[p]ermanently close and rehabilitate sites that cannot accommodate use without unacceptable impacts to riparian resources." Forest Plan at III-184.

The Forest Service documented evidence that the Tellico ORV trails were neither designed nor maintained adequately to meet water quality standards and protect water quality. (AR 10674, 10677, 10618, 10673) As noted above, visible sediment was clearly reaching streams from the degraded ORV trails. (AR 10644) In addition, the Tellico ORV area encompassed twice as many trail miles as

24

allowed by the Forest Plan and included "high challenge" areas that violated Forest Plan standards. (AR 10646) Furthermore, six miles of trail within 100 feet of streams (Management Area 18) were found to be incapable of accommodating ORV use without causing unacceptable impacts, necessitating their closure. (AR 10644, 10690) Because the Forest Service must ensure that all decisions are consistent with the Forest Plan, it had no choice but to close the Tellico ORV trails when it found they were not consistent with the Forest Plan. When the Forest Service determined that it lacked the capacity to manage ORV trails in the Tellico River watershed in compliance with Forest Plan standards, and that only Alternative C had a high likelihood of meeting those standards, it was required to close the area permanently.

3.     <u>The Closure Orders Were Mandated by the Forest Service's Travel Management Rule.</u>

The ORV Clubs contend that the Forest Service failed rationally to apply its own Travel Management Rule to the Tellico ORV system. (Compl. at ¶ 97) To the contrary, the Forest Supervisor's closure orders were also mandated by that rule.

The Forest Service has implemented federal policy regarding ORV usage through its Travel Management Rule, which directs that, upon finding that an ORV trail is causing "considerable adverse effects on public safety or soil, vegetation, wildlife, wildlife habitat, or cultural resources" the Forest Service "*shall* immediately close that road, trail, or area to motor vehicle use until the official

25

determines that such adverse effects have been mitigated or eliminated and that measures have been implemented to prevent future recurrence." See 36 C.F.R. § 212.52(b)(2).[3]

The Forest Service's Travel Management Rule <u>required</u> the Forest Service, upon finding that ORV trails were damaging natural resources, to close the ORV trails until they were corrected such that further damage would not occur. The Forest Service documented extensive adverse effects to soil, wildlife and wildlife habitat caused by the Tellico ORV Trails. More than 75,000 tons of soil had eroded away from the trails over the years with substantial additional erosion continuing with each additional year. (AR 10645, 11673, 2027) Eroded sediment was reaching streams, causing high turbidity (AR 10645, 10683-84) and filling stream beds with fine sediment (AR 10685-10689) which, in turn, impeded trout reproductive success (AR 10645-46, 10712). These findings compelled the Forest Service to close the Tellico ORV trails immediately through the Remedial and Interim Closure Orders.

In addition to mandating short-term closure to prevent resource damage, the Travel Management Rule proscribes standards for the long-term decision to

---

[3] Federal policy with regarding ORV trails on public lands is set by an Executive Order issued by President Nixon which was subsequently reissued by President Carter. See Executive Orders 11644 and 11989. That Order sttes that if "the use of off-road vehicles will cause or is causing considerable adverse effects on the soil, vegetation, wildlife, wildlife habitat" or other resources, the agency must "immediately close such areas or trails to the type of off -road vehicle causing such effects" until "such adverse effects have been eliminated and that measures have been implemented to prevent future recurrence." Id.

26

designate an area as suitable for ORV recreation. In making such a designation, the Forest Service must consider effects on "natural and cultural resources, public safety, provision of recreational opportunities, access needs, conflicts among uses of National Forest System lands, the need for maintenance . . . and the availability of resources for that maintenance and administration." 36 C.F.R. § 212.55(a). For ORV trails in particular, the agency must have the objective of "minimizing . . . [d]amage to soil, watershed, vegetation and other forest resources" and "[h]arassment of wildlife . . . ." 36 C.F.R. § 212.55(b).

The Forest Service carefully applied these criteria and developed a thorough record that compelled the conclusion that the watershed of the Tellico Trout Waters is unsuitable for an ORV area. In addition to the documentation in its EA, the Forest Service prepared a Travel Analysis Report of the Tellico Road System in compliance with Forest Service guidance. (AR 10380-10418) The Forest Service documented extensive damage to natural resources from ORV travel in the area (AR 10645-46, 10712, 10683-84, 10644, 10645-46, 10712), the availability of other ORV recreational opportunities in the region (AR 10789-10791), the expensive reconstruction and maintenance required to operate the ORV area to meet state and federal standards (AR 10824, 10867), and its limited resources to fund those reconstruction and maintenance obligations (AR 10865). Furthermore, only total closure of the ORV system (Alternative C) was considered to have a

27

high likelihood of preventing damage to soil, the watershed and wildlife. (AR 10690)

When the Forest Service determined that it lacked the capacity to manage ORV trails to prevent resource damage in the long term and that only Alternative C had a high likelihood of meeting state and federal standards, the Travel Management Rule required it to close the area permanently.

**B. The Forest Service Complied With The National Environmental Policy Act.**

   1. <u>The Forest Service was not Required to Prepare an Environmental Impact Statement to Analyze Environmentally Beneficial Impacts</u>.

The ORV Clubs claim that the Forest Service violated the requirements of the National Environmental Policy Act by preparing an Environmental Assessment ("EA") rather than a full Environmental Impact Statement ("EIS"). (Compl., Count 2) They further argue that the Forest Service failed adequately to analyze the incidental environmental impacts of closing degraded trails. (Compl., Count 1)

Under NEPA, a federal agency must prepare an EIS (called a "detailed statement" by the statute) to evaluate actions "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). Federal agencies may prepare an EA to determine whether an EIS is required or, alternatively, a Finding of No Significant Impact is warranted. 40 C.F.R. § 1508.9.

28

The ORV Clubs do not contend, nor could they, that the Forest Supervisor's closure orders had anything other than a positive impact on the environment. Instead, the ORV Clubs argue that an EIS must be prepared for significant impacts, even if they are significantly beneficial to the environment. (Compl. at ¶ 61; Pl. Summ. J. at 28-29) The ORV Clubs cite a regulation stating that a "significant effect may exist even if the Federal agency believes that on balance that effect will be beneficial." See Id. (citing 40 C.F.R. § 1508.27(b)(1). The point of that regulation, however, is that even if a project has significant beneficial impacts on net, an agency cannot ignore significant adverse impacts. That rule has no bearing on an action for which the only significant impacts are beneficial in nature.

As reasoned by the Sixth Circuit, "[i]t would be anomalous to conclude that an environmental impact statement is necessitated by an assessment which identifies beneficial impacts while forecasting no significant adverse impacts, when the same assessment would not require the preparation of an impact statement if the assessment predicted no significant beneficial effect." Friends of Fiery Gizzard v. Farmers Home Admin., 61 F.3d 501, 505 (6th Cir.1995). Federal regulations direct that an assessment impacts should look to their "intensity," defined as "the severity of impact." 40 C.F.R. § 1508.27(b). The choice of adjectives is significant, because "one speaks of the severity of adverse impacts, not beneficial impacts." Friends of Fiery Gizzard, 61 F.3d at 504. See also

29

Rosebud Sioux Tribe v. Gover, 104 F. Supp. 2d 1194, 1211 (D.S.D. 2000); Wilds v. Slater, 2000 U.S. Dist. LEXIS 20771 (D.S.C. Mar. 7, 2000). Because the Forest Supervisor's closure orders will not cause significant adverse impacts to the environment, no EIS was required.

Furthermore, the ORV Club's contention that the Forest Service did not consider temporary impacts caused by closure of degraded ORV trails is inaccurate. (Compl., Count 1) The EA noted that work to close degraded trails under may cause a short term "increase in sedimentation and turbidity in streams during construction where existing trail crossings are decommissioned and residual road crossings are required." (AR 10593, 10702, 10720).

Finally, the ORV Clubs suggest the Forest Service failed to analyze impacts caused by nonmotorized recreation in the Tellico area. (Compl. at ¶ 53) Because none of the alternatives considered by the Forest Service changed the rules for use of the Tellico area for nonmotorized recreation, no analysis was required.

Because the Forest Service was not required to prepare an EIS and because it fully considered all potentially adverse impacts associated with the Closure Orders, Counts 1 and 2 of the ORV Club's complaint lack merit as a matter of law.

2.      The Forest Service Fully Considered a Broad Range of Alternatives.

The ORV Clubs allege that the Forest Service failed to consider any alternative to closure (Compl., Count 3) and considered an inadequate range of

alternatives (Compl., Count 6).  The ORV Clubs contend that "no alternative was considered that would have required active and effective recreation management" because the Forest Service was "intent on closing the System" and no alternatives besides closure were "legitimately" considered.  (Compl. at ¶¶ 92, 68)

To the contrary, the Forest Service considered multiple alternatives in great detail.  Its initial scoping notice for long term management of the Tellico ORV area proposed to keep the area open to ORV traffic.  (AR 02831)  After further evaluation, the Forest Service released a draft Environmental Assessment for public comment with six detailed alternatives.  (AR 54945501)  Five alternatives kept some portion of the area open to ORV traffic.  Id.

In its final EA, the Forest Service evaluated additional proposals submitted by the public including the ORV Clubs and Trails Unlimited.  (AR 10659, 9812, 2316, 10660-61, 2613, 10864)  The Final EA also created a new alternative (F-modified) that would <u>expand</u> available ORV trails.  (AR 10657) Alternative F-modified would have required the a $6.2 million capital investment and $2.2 million annually to manage ORV recreation.  (AR 10824)

ORV Clubs argue that the Forest Service conducted "minimal analysis" before issuing its first Remedial Closure Order. (Compl. at ¶ 67) As temporary closures needed for resource protection, however, the Remedial and Interim closure orders were exempted from public notice requirements, 36 C.F.R. §

31

212.52(b)[4], and were categorically excluded from environmental analysis under NEPA. See AR 3601; 40 C.F.R. §§ 1507.3(b), 1508.4; 36 C.F.R. § 220.6(d)(1). Furthermore, as is described above, the closure orders were supported by years of monitoring of sediment levels and trout habitat, the findings of the Watershed Assessment, and trail condition surveys.

The ORV Clubs further argue that the Remedial and Interim Closure Orders "cemented a legacy of closure" that foreclosed consideration of other alternatives. Pl. Summ. J. at 2. Not so. As explained above, the Remedial and Interim Closure orders were not the product of agency predisposition against ORV trails, but rather legally mandated steps to prevent impacts to soils, water quality and aquatic habitat. Furthermore, the temporary closures in no way restricted management options available to the Forest Service in the future. And contrary to Plaintiff's suggestion (Compl. at ¶ 42), advance announcement of trail closure as a preferred alternative was not an "unusual step," but routine. 40 C.F.R. § 1502.14(e).

Because the Forest Service rigorously explored "all reasonable alternatives," as it was require to do by federal law, 40 C.F.R. § 1502.14(a), Counts 3 and 6 of the ORV Clubs' complaint are meritless as a matter of law.

---

[4] The Federal Register notice announcing the Travel Management Rule explains that the procedure for emergency closures under 36 C.F.R. § 212.52(b)(2) does not require "documentation of impacts and consideration of alternatives" because such requirements would frustrate the purpose of Executive Orders "which require the responsible official to close a road, trail, or area immediately when motor vehicle use on that route or in that area is causing considerable adverse effects." 70 FR 68264, 68280 (Nov. 9, 2005).

3. <u>The Forest Service Fully Disclosed Relevant Data and Correctly Applied Legal Standards.</u>

The ORV Clubs argue that the Forest Service's closure orders are tainted by technical deficiencies (Compl., Count 4), illegal conclusions (Compl., Count 5), and a failure to apply the Forest Service's Travel Management Rule (Compl., Count 7). These claims are without merit.

First, the ORV Clubs allege the Forest Service failed to present required information relying instead on "undocumented narrative." (Compl. at ¶ 75) The law is clear, however, that NEPA analyses should incorporate material by reference whenever possible. 40 C.F.R. § 1502.21. The Forest Service's 192-page Environmental Assessment was supported by citation to studies, reports and data in an 11,500 administrative record. Nothing more is required.

Second, the ORV Clubs argue the EA inadequately discussed and mischaracterized a graduate student's survey of aquatic macroinvertebrates in an effort to support its closure decision. (Compl. at ¶ 76) In fact, the Forest Service cited the survey for the proposition that "there is no difference among the survey streams" in aquatic macroinvertebrates as a result of ORV trails. (AR 10714)

Third, the ORV Clubs contend that the Forest Service erroneously relied on a second macroinvertebrate study prepared by state biologists after the close of public comment on the draft EA. (Compl. at ¶ 77-78; Pl. Summ. J. at 20-21) The Forest Service discussed the results of the state's report in its final EA, noting that

33

macroinvertebrate communities appeared to be unaltered by erosion from the ORV area. (AR 10714) NEPA does not bar the Forest Service from seeking new information to better understand comments and data gathered during public comment. A Supplemental EA and second comment period is required only when the new information "is significant or uncertain and the EA/FONSI is no longer valid." City of Las Vegas, Nev. v. F.A.A., 570 F.3d 1109, 1117 (9th Cir. 2009).

Ultimately, neither the graduate students thesis nor the state survey call the Forest Service's decision or NEPA process into question. The Forest Service's EA concluded that "aquatic insects are generally poor indicators of ecosystem stress due to sedimentation" and cited scientific research supporting that proposition. (AR 10714) In any event, the Forest Service documented conditions (visible sediment reaching streams, excessive turbidity, eroding soils, declining trout) that each was legally sufficient to compel the Closure Orders. Agency decisionmaking under NEPA is subject to a harmless error rule for minor procedural deficiencies that have no chance of "altering the agency's deliberations or conclusions." Save Our Cumberland Mountains v. Kempthorne, 453 F.3d 334, 347 (6th Cir. 2006).

Plaintiffs further contend that the Closure Orders are predicated on mistaken interpretations of law and fact about the extent to which ORV travel was causally connected to excessive turbidity, damage to wildlife and degradation of water

quality, (Compl. Count 5), and that the agency failed to apply the Travel Management Rule to its decision, (Compl. Count 7). Those arguments are already refuted above. The record is more than adequate to support the agency's conclusions.

Because the Forest Service fully disclosed and accepted public comment on all information necessary to inform its decision, and because the record well supports the agency's conclusions and properly applies the Travel Management Rule, Counts 4, 5 and 7 of the ORV Club's complaint fail as a matter of law.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, Intervenors are entitled to summary judgment as a matter of law.

Respectfully submitted this 4th day of August, 2011,

<div style="margin-left:2em">

s/Austin D. J. Gerken
Austin D.J. Gerken
NC Bar # 0032689
Southern Environmental Law Center
22 South Pack Square, Suite 700
Asheville, NC  28801
djgerken@selcnc.org
Counsel for Intervenor-Defendants

</div>