# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### BRYSON CITY DIVISION

## CIVIL CASE NO. 2:10cv15

| | |
|---|---|
| SOUTHERN FOUR WHEEL DRIVE ASSOC., | ) |
| UNITED FOUR WHEEL DRIVE ASSOCIATIONS, | ) |
| THE BLUERIBBON COALITION, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) |
| UNITED STATES FOREST SERVICE, | ) |
| NANTAHALA NATIONAL FOREST, | ) |
| MARISUE HILLIARD, Forest Supervisor, | ) |
| | ) |
| Defendants. | ) |
| | ) |
| TROUT UNLIMITED, PUBLIC EMPLOYEES FOR | ) |
| ENVIRONMENTAL RESPONSIBILITY, | ) |
| WILD SOUTH, | ) |
| | ) |
| Intevenor-Defendants. | ) |
| _____ | ) |

## MEMORANDUM OF DECISION AND ORDER

**THIS MATTER** is before the Court on the following matters:

1.    The Plaintiffs' Motion for Summary Judgment [Doc. 32];

2.    The Defendants' Motion for Summary Judgment [Doc. 38]; and

3.    The Intevenor-Defendants' Motion for Summary Judgment [Doc. 40].

## PROCEDURAL HISTORY

On May 18, 2010, the Plaintiffs brought this action pursuant to the Administrative Procedures Act (APA), 5 U.S.C. §§551, *et. seq.*, seeking judicial review of a final agency action. [Doc. 1]. The Plaintiffs seek declaratory judgment and injunctive relief requiring the Defendants to adhere to the National Forest Management Act (NFMA), 16 U.S.C. §§1600, *et. seq.*, the National Environmental Policy Act (NEPA), 42 U.S.C. §§4331, *et. seq.*, and the APA in connection with the final agency decision of October 14, 2009 to prohibit and restrict recreational vehicular access to the Upper Tellico Off-Highway Vehicle (OHV) System of the Nantahala National Forest (the Forest). [Id.].

On June 17, 2010, the Intervenor-Defendants moved to intervene in the action based on their status as nonprofit organizations dedicated to the conservation of water quality, trout habitat and responsible management of the National Forests, including Nantahala. [Doc. 12-1]. No opposition to that motion was filed by either the Plaintiffs or the Defendants and the motion was granted. [Doc. 16].

On December 6, 2010, the parties reported that a mediated settlement conference had been unsuccessful. [Doc. 27]. As a result, the parties, who

2

concede the case should be resolved on the pleadings, were provided deadlines within which to file motions and cross-motions for summary judgment.[1] [Doc. 29; Doc. 31; Doc. 33 at 2; Doc. 43 at 1]. The parties did, however, requested oral argument on those motions. [Doc. 44; Doc. 45]. Oral argument having been held on August 23, 2012, the motions are ripe for disposition.

## STANDARDS OF REVIEW

NEPA is a statute which "sets forth a regulatory scheme for major federal actions that may significantly affect the natural environment." <u>Webster v. U.S. Dept. of Agriculture</u>, 685 F.3d 411, 417 (4th Cir. 2012). NFMA governs the United States Forest Service's regulation of the National Forest System. 16 U.S.C. §§1600, <i>et. seq</i>. NEPA requires the United States Forest Service (Forest Service) to "consider the cumulative impact on the environment of related federal actions." <u>Shenandoh Ecosystems Defense Group v. U.S. Forest Service</u>, 194 F.3d 1305 **3 (4th Cir. 1999). Claims which challenge federal agency action taken pursuant to NEPA are subject to judicial review pursuant to the APA. <u>Friends of Back Bay v. U.S. Army Corps of Engineers</u>,

---

[1]The parties filed portions of the Administrative Record as exhibits to their pleadings and submitted the entire record <i>in camera</i>. Only those portions cited within this decision have been filed in the docket of the case.

681 F.3d 581, 586 (4th Cir. 2012).

> In reviewing an agency's efforts to comply with the NEPA, [the court's] task is to ensure that [the agency] took a hard look at the environmental consequences of the proposed action. ... A hard look involves, at minimum, a thorough investigation into the environmental impacts of [the] action and a candid acknowledgment of the risks that those impacts entail. In conducting this review, [the court] may not flyspeck [the] agency's environmental analysis, looking for any deficiency, no matter how minor. Instead, [the court] must take a holistic view of what the agency has done to assess environmental impact and examine all of the various components of [the] agency's environmental analysis ... to determine, on the whole, whether the agency has conducted the required hard look.

> Moreover, because the [APA] governs [the] review of claims brought under the NEPA, [the court] may set aside the agency's decision only if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. This involves a searching and careful, but ultimately narrow and highly deferential inquiry. In the end, [i]f the agency has followed the proper procedures and if there is a rational basis for its decision, [the court may] not disturb its judgment.

Webster, 685 F.3d at 422-23 (internal citations and quotations omitted).

Because this case involves the review of agency action pursuant to the APA, the Court's review is confined to the administrative record on which the agency's decision was based. Tinicum Township., Pa. v. U.S. Dept. of Transportation, 685 F.3d 288 (3rd Cir. 2012) (citing 5 U.S.C. §706(2)(A)); Ohio Valley Environmental Coalition v. Aracoma Coal Co., 556 F.3d 177, 201 (4th Cir.), cert. denied __ U.S. __, 131 S.Ct. 51, 177 L.Ed.2d 1141 (2010) (review

of agency action is limited to the administrative record unless the issue is the adequacy of an environmental impact statement or a determination that one is unnecessary).

All of the parties have moved for summary judgment. "Under APA section 706(2) review, the court does not employ the usual summary judgment standard. This is because the court is not generally called upon to resolve facts in reviewing agency action." Center for Sierra Nevada Conservation v. U.S. Forest Service, 832 F.Supp.2d 1138, 1148 (E.D.Cal. 2011) (citing Occidental Engineering Co. v. Immigration and Naturalization Service, 753 F.2d 766, 769-70 (9th Cir. 1985) (other citations omitted); Syngenta Crop Protection, Inc. v. U.S.E.P.A., 2011 WL 3472635 **17 (M.D.N.C. 2011).

> Under the APA, it is the role of the agency to resolve factual issues to arrive at a decision that is supported by the administrative record, whereas "the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review.

University Medical Center, Inc. v. Sebelius, ___ F.Supp.2d ___, 2012 WL 1309133 **7 (D.D.C. 2012) (quoting Occidental, 753 F.2d at 769-70).

5

# FACTS FROM THE ADMINISTRATIVE RECORD[2]

As previously noted, this case involves review of the Defendants' decision to prohibit and restrict recreational vehicular access to the Upper Tellico OHV System (the System, or the trail system) of the Forest. The Plaintiff Southern Four Wheel Drive Association "is a nonprofit organization formed in 1987 and dedicated to promoting four-wheel drive recreation, responsible land usage, conservation and education." [Doc. 1 at 2]. Its members used the trail system before its closure. [Id. at 3].

The Plaintiff United Four Wheel Drive Associations consists of individual members, clubs and associations sharing an interest in recreational off-road activities, including the use of four wheel drive vehicles. [Id.]. Its members also used the trail system before its closure. [Id.].

The Plaintiff The BlueRibbon Coalition, Inc. is a nonprofit corporation whose members use off-road vehicles, horses and bicycles to access lands managed by the Forest Service. [Id.]. Its members also used the Tellico trail system before its closure. [Id.].

The Upper Tellico OHV System is located in Cherokee County, North Carolina within the Forest. [AR 10643]. The headwaters of the Tellico River

---

[2]Unless otherwise noted, all facts are taken from the Administrative Record.

6

are located in Cherokee County, North Carolina.  The river flows from there into Tennessee.  It is on the watershed of the Tellico that the System is located. [AR 10643].  In 1991, the North Carolina section of the Tellico River was classified as wild trout waters by the North Carolina Wildlife Resources Commission. [Id.].  The Tellico watershed receives more than 80 inches of rain per year, with the rainiest months being from December through March. [AR 10655].  The soils of the Tellico watershed have been classified by the Natural Resources Conservation Service (NRCS) as a severe erosion hazard and poorly suited for dirt roads.[3] [AR 10669].

At issue is the system of off-road trails based on old logging roads constructed over fifty years ago by private logging companies and land owners.  [AR 404].  Eighty-five percent of these former logging roads and trails are surfaced with bare soil and do not meet current standards.  They could not have been built had those standards been in place at the time of their construction. [AR 10666, 10670, 10672].

In 1980, the Forest Service acquired the properties on which the System is located. [AR 00740].  The Forest Service closed trails which were environmentally unacceptable but maintained twelve numbered trails which

---

[3]The NRCS is an agency of the United States Department of Agriculture. Webster, 685 F.3d at 416 n.1.

Case 2:10-cv-00015-MR-DCK   Document 47   Filed 09/19/12   Page 7 of 50

were open to off-road vehicles. [AR 265, AR 10783].   On May 1, 1986, the System was officially established by the Forest Service. [AR 10643].   The System included high challenge areas which featured exposed boulders and bedrock which were passable only by specialized four wheel rock crawlers. [AR 10783].   The trails accessible to four wheel drive vehicles had been poorly maintained and the rate of erosion increased as the usage of the trials increased. [AR 10678].   Ironically, the greater the rate of erosion, the more these roads were used because challenging trails became all the more challenging and hence, more popular. [AR 10783].   In 1997, 1,472 off-road vehicles per month used the System.   [AR 265, 02814].   By 2006, 1,986 vehicles per month were using the System, but by the time of the initial closure of the System in December 2007 that had decreased to 1,411 vehicles per month continued to use the System.  [AR 2157-61, 02814].

The Forest Service did not conduct an initial environmental assessment of the area when it first acquired the tract and trails in 1980.  [AR 00787].  In September 2004, the Service published the Upper Tellico Assessment and Strategy in which it noted that monitoring the impact of the use of off-road vehicles on water quality needed to commence.  [AR 263-85].  It also noted that a full-time administrator on the site was necessary, as well as certain

improvements to the trails and crossings. [Id.].

Because of the evidence of increased erosion, the Forest Service conducted its first comprehensive assessment of the System in 2005. [AR 402-44]. In a report published in September 2005, the Forest Service found:

> [W]ithin the Upper Tellico River watershed[,] streams draining areas with OHV trails have a higher concentration of suspended sediment than those drainages without OHV trails.
> ...
> Poor design and location, in combination with excessive use, has resulted in deteriorated travelways to the point that regular road/trail [Best Management Practices] are no longer adequate to protect trails from erosion and stream channels from sedimentation.
> ...
> [O]verall trout densities within the Upper Tellico area are measurably lower than streams of similar size, topography and geology across the Forest.

[AR 417, 418, 435]. The Forest Service further noted that a "knowledge gap" existed concerning the impact of the accelerated erosion on aquatic communities within the System and the Forest in general. [AR 418-19].

In early 2007, the North Carolina Wildlife Resources Commission (NCWRC) sought to close that knowledge gap by publishing its report titled "A Summary of Wild Trout Population Monitoring in the Tellico River Watershed, 1994-2006" (Report). [AR 739-61]. In the Report, NCWRC documented that between 2003 and 2006, surveys at several locations within

9

the System found no newly spawned or less than one year old trout. [AR 740, 743]. Samples conducted at higher elevations and further from the trails showed better results than samples taken downstream from the trails. [AR 743-44]. The deposit of sediment both from natural environmental factors as well as the System was noted to have had a detrimental impact on trout reproduction with reproductive failures occurring in 50% of the Tellico River. [AR 745]. The Report concluded that the "[i]ncreased reproductive failures at the Tellico River sites heightens the risk of losing the trout populations from those sections entirely." [Id.]. NCWRC recommended that a study be conducted to determine the effect of the environmental factors, both natural and manmade, on the wild trout populations in the Tellico River Watershed. [Id.]. The study, it recommended, should include "measurements of sediment loading (sources, rates, and timing) and other water quality parameters." [Id.].

Intervenor-Defendant Trout Unlimited met with the Forest Service on June 21, 2007 concerning the NCWRC Report. [AR 773-75]. The Administrative Record shows that the meeting was attended by members of the Southern Environmental Law Center (SELC) which represented Trout Unlimited and Public Employees for Environmental Responsibility. [AR 774, 788]. Although the meeting was congenial, the Intervenor-Defendants gave

the Forest Service Notice of Intent to Sue seven days later.[4] [AR 776]. The Plaintiffs refer to this as a "private meeting." [Doc. 33 at 4]. The Administrative Record, however, does not show any request by the Plaintiffs to participate in the meeting or to meet separately with Forest Service representatives.

On August 24, 2007, the Forest Service conducted a meeting with "stakeholders;" that is, organizations having an interest in the System and the Tellico River Watershed. [AR 816]. Among the "stakeholders" attending the meeting were Plaintiff Southern Four Wheel Drive Association and Intervenor-Defendant Trout Unlimited. [Id.]. A major topic of discussion was the possibility of seasonal or temporary closing of the trails. [AR 817]. During that meeting, it was disclosed that Trout Unlimited had met with the Forest Service, was not pleased with the outcome of that prior meeting and had filed a Notice of Intent to Sue.[5] [AR 819]. References in the notes from that meeting show that the Service had routinely met with the stakeholders. [AR 819].

_____

[4]The record contains nothing showing that a suit was thereafter initiated.

[5]The notes from the meeting contain a statement by the representative for Trout Unlimited that he had met with the Forest Service, was "pleased" with the proposals and had filed the notice of intent to sue. [Id.]. It appears that the word "not" was omitted from the notes; otherwise, the sentence would appear to be inconsistent.

11

On September 13, 2007, Trails Unlimited, a subdivision of the Forest Service, submitted its "Review of the existing Tellico OHV Trail System on the Nantahala NF for Maintenance Practices, Realignment-Reconstruction and their associated costs." [AR 835, 844]. The purpose of the review was to assess the condition of the area and costs associated with its continued maintenance. [AR 835]. In the report it is repeatedly noted that the "costs do not reflect environmental review." [AR 835-44]. Despite these limiting statements, the Plaintiffs contend that, in this report, Trails Unlimited concluded that the main problem with the Tellico OHV System was a lack of maintenance which could be remedied with appropriate work and budget. [Doc. 33 at 6].

On September 17, 2007, the Forest Service elicited public comment on a proposal to temporarily close three trails and to prohibit winter use of the System. [AR 855]. The stated reason for the proposal was "to correct and/or repair ongoing impacts to the aquatic resources caused by sediment entering waters from the Tellico trail system." [Id.]. The public was asked to make comments on or before October 17, 2007. [AR 856].

On September 21, 2007, the Forest Service met with representatives of Trout Unlimited and SELC. [AR 859]. The Plaintiffs refer to this as "another

12

private meeting." [Doc. 33 at 7]. The Plaintiffs have not, however, pointed to anything in the Administrative Record showing that they were denied access to any such meetings with the Forest Service. In fact, the notes from this meeting contain a recommendation that the Forest Service should meet with all interested parties at the conclusion of the comment period. [AR 859]. Representatives from Trout Unlimited and SELC stated they would arrange a meeting which would include Southern Four Wheel Drive. [Id.].

The parties concede that the Administrative Record shows a "flurry of agency internal activity" throughout the fall of 2007.[6] [Doc. 33 at 7; Doc. 40-1 at 6; Doc. 39 at 13]. The Forest Service adopted a plan to monitor sediment levels in the water, to measure sediment deposits in stream beds, and to assess aquatic macroinvertebrates. [AR 2116, 2117, 2121]. The Forest Service initiated and completed trail condition surveys which were conducted by staff having experience in engineering, fisheries and hydrology. [AR 2041, 2051]. Every feature within the System was photographed and the movement of sediment was measured. [AR 2043, 6175].

On December 18, 2007, the Forest Service issued the Forest

_____

[6]Indeed almost 1,255 pages in the Administrative Record deal with these initiatives and assessments. The Court has not required all such documents to be filed in the record of this case.

13

Supervisor's Orders for the Upper Tellico Off-Highway Vehicle Area. [AR 2141]. It was therein determined that Trails 7, 8, 9 and Lower Trail 2 should be temporarily closed for a one year period and that the entire area should be closed from January 1 through March 31 of 2008. [Id.]. In making this determination, the Forest Supervisor cited the Forest Plan, noting that the use of off-road vehicles was approved only "if such use does not adversely affect other resources."[7] [Id. at 2142]. The temporary closures were necessary, she wrote, "to correct ongoing impacts to area waters and aquatic resources caused by sediment from the Upper Tellico road and trail system." [Id.]. The Supervisor also cited three trail bridges on Trail 8 which were unsafe for off-road vehicles, requiring their emergency closure. [Id.]. The closure was implemented pursuant to the Forest Plan and 36 C.F.R. §261.50(b) which authorized the Supervisor to "issue orders which close or restrict the use of any National Forest System road or trail within the area over which [s]he has jurisdiction." [Id. at 2143]. Citing the United States Forest Service Handbook, the Supervisor found that because the closures "[did] not individually or

---

[7]The Forest Plan specifically directs the management of trails in such way as to "minimize adverse effects on riparian area resources." [Doc. 39-2 at 3]. The Plan dictates that streams be managed for "self-sustaining fish populations" and for "wild trout." [Id.]. It also requires that the Forest Service maintain trails in such a manner that "no visible sediment reaches the stream channel[s]." [Id.].

14

cumulatively have a significant effect on the quality of the human environment, . . . [they] are categorically excluded from documentation in an Environmental Assessment or Environmental Impact Statement," [Id.] and further found that "no extraordinary circumstances exist that warrant any further analysis and documentation." [Id.].

On May 22, 2008, a lawsuit was brought in this Court by some of the same plaintiffs herein against the defendants herein challenging this interim closure order. United Four Wheel Drive Association, _et. al_. v. United States Forest Service, _et. al_., Civil Case No. 2:08cv11. On October 30, 2008, the parties filed a Stipulation of Dismissal without prejudice "in light of the Forest Service's stated intention to complete a public planning process and announce a new decision in the near future which will likely substantially impact or change the interim orders referenced in the complaint[.]" Id. at Doc. 40.

While that lawsuit remained pending, on June 9, 2008, the Forest Service again elicited public comment on a proposal to reduce the size of the System from 39.5 miles to 24 miles, while implementing modifications and use management techniques to reduce sediment discharge. [AR 2824]. Included in the notice were the following directives: "The road and trail system cannot

continue to contribute additional visible sediment to the Tellico River and its Tributaries" and "The road and trail system cannot repeatedly incur excessive maintenance and reconstruction cost." [AR 2831]. It was noted that the current management plan was not economically or environmentally viable. [AR 2832]. The notice also advised that an Environmental Assessment was being completed. [Id.].

A public meeting was held on June 28, 2008. [AR 2902]. Written comments were received from the public, including Southern Four Wheel Drive Association. [AR 2890, 2903-3083, 3137-3244, 4432-86].[8] Throughout the remainder of 2008, the Forest Service worked on an Environmental Assessment.

The Forest Service issued a Predecisional Environmental Assessment in February 2009. [AR 5483]. In the 209 page assessment, the Supervisor discussed alternatives to closure but concluded that she could not recommend keeping the System open for off-road recreational vehicle use.[9] [AR 5700]. On February 27, 2009, the Forest Service again solicited public comment with the Supervisor noting:

[8]These comments are part of the Administrative Record but due to the volume thereof, they have not been filed in the record of this case.

[9]Again, although the entire Predecisional Environmental Assessment is part of the Administrative Record, it has not been filed in the record of this case.

16

The EA [Environmental Assessment] shows that the Upper Tellico
OHV System has extensive damage and contributes
unacceptable levels of sediment into the Tellico River and its
tributaries. Sediment is leaving the OHV System from more than
2,000 locations along the trails. The Agency is in violation of
North Carolina state water quality standards because of the
conditions on Upper Tellico OHV System. ... While I understand
how important the Upper Tellico OHV System is to OHV users,
the impacts to water quality are so significant that I cannot
recommend keeping the System open at this time. After careful
consideration of the environmental effects of the alternatives as
presented in the EA, my preferred alternative is Alternative C,
which closes the OHV System. Alternative C would maintain over
10 miles of existing Forest system roads (currently also OHV
trails), open year-round or seasonally, to provide public access for
hunting, fishing and other recreation uses. Trail 1 ... would be
paved and kept open as a through route for highway-legal
vehicles.

[AR 5700].

An Interim Closure Order was issued on March 31, 2009 during the

public comment period. [AR 6300]. Approximately 3,700 pages of the

Administrative Record consist of the comments received in response thereto.

On October 14, 2009, the Forest Service issued its final Environmental

Assessment and Decision Notice.[10] [AR 10614, 10630, 10639]. In the final

Environmental Assessment, which is in excess of 250 pages, the Forest

Service considered alternatives to closing the System which had been

---

[10]There were actually two decision notices issued, one of which dealt with the
conversion of Trail 1 into a paved forest road. The Plaintiffs do not attack that decision.
[Doc. 33 at 10 n.1]. It will therefore not be addressed further.

17

proposed by off-road vehicle organizations, including one proposed by Trails Unlimited. [AR 10659-61]. Based on the trail surveys and assessments conducted by the Forest Service, all the alternatives proposed by stakeholders and others were rejected as economically and geographically unfeasible. [AR 10660-61]. The Forest Service made the following findings:

1.  The Forest Plan standards for soil and water were being violated. [AR 10644].

2.  The Service's Best Management Practices were failing. [Id.].

3.  Due to the heavy off-road use of the System, inadequate maintenance, severe erosion and heavy rainfall, the Best Managements Practices were not sustainable. [Id. at 10644-45].

4.  North Carolina standards for turbidity in the Tellico River were being violated. [Id. at 10645].

5.  The reproduction of trout had been and continued to be negatively impacted. [Id.].

6.  The System violated the Forest Plan standards for trail density and level of challenge. [Id. at 10646].

7.  The System also was not in compliance with the Travel Management

18

Rule and was not financially or environmentally sustainable.[11] [Id.].

The Forest Service determined to close the System to all OHV traffic, except for 13.4 miles of trails which were to be converted to forest roads for street-legal vehicles. [AR 10653]. The area would remain open for foot travel once trails were rehabilitated. [Id.].

The Plaintiffs thereafter brought this action asserting that the Forest Service failed to comply with the NFMA and the NEPA.

## DISCUSSION

### I.  The Plaintiffs' Motion for Summary Judgment.

The Plaintiffs present several assignments of error, asserting various violations by the Forest Service in making its determination.  Each of these is addressed separately.

#### A.  The Forest Service predetermined the outcome.

In this assignment of error, the Plaintiffs claim that the Forest Service made a final determination to close the Tellico OHV System before conducting the required environmental analysis through either an Environmental Assessment (EA) or an Environmental Impact Statement (EIS).  In making this allegation the Plaitniffs argue that the December 18, 2007 Order temporarily

---

[11]A comparison of the financial burdens of each alternative considered in the final Environmental Assessment was attached thereto. [AR 10864-68].

closing certain trails within the System for a one year period and seasonally closing the entire System was in fact the final determination by the Forest Service.

On May 22, 2008, the Plaintiffs herein brought a civil action against these same Defendants in order to "challenge the Forest's decision to prohibit and restrict vehicular access along previously-open roads and trails through the Forest Supervisor's Orders and Decision Memo dated December 20, 2007[.]"[12] United Four Wheel Drive Association, et. al. v. United States Forest Service, et. al., Civil Case No. 2:08cv11 at Doc. 1. The parties filed a stipulation of dismissal on October 30, 2008, noting that the Forest Service was continuing a planning process which would impact or change this interim order. Id. at Doc. 40. By basing its dismissal on the acknowledgment that the Forest Service's work regarding the issue was on-going, the plaintiffs in that action conceded that no final agency action had yet occurred. Having acknowledged that their first lawsuit was premature, the Plaintiffs are now estopped from asserting that the final decision had by then been made. "Review under the APA is ...limited to "final agency action" for which there is no other adequate remedy in a court." Fund for Animals, Inc. v. U.S. Bureau

---

[12]It is undisputed that this is a reference to the December 18, 2007 Order.

of Land Management, 460 F.3d 13, 18 (D.C.Cir. 2006) (quoting 5 U.S.C. §704) (emphasis in original).  If no final agency action has occurred, the action is not reviewable.  Id.  To the extent that the Plaintiffs' claim is based on the December 2007 interim decision, it  must fail because that decision was a non-final agency action.

Moreover, the December 2007 decision became moot when the final agency action was issued in October 2009 because it was superseded by that final decision.  Id.; Theodore Roosevelt Conservation Partnership v. Salazar, 744 F.Supp.2d 151, 164-65 (D.D.C.), affirmed 661 F.3d 66 (D.C.Cir. 2011) (dismissing NEPA claim based on decision that had been superseded and thus ceased to have any effect).  Thus, any claim based on the interim order must be dismissed as moot.

The Plaintiffs also argue that the Forest Service predetermined the outcome of the entire proceeding by implementing the temporary closure before an EA was completed.  In making this claim, however, the Plaintiffs make no attempt to refute the Forest Supervisor's conclusion in her December 18, 2007  Order that neither an EA nor an EIS was required. [AR 2143].  For this reason alone, the claim must be rejected.

Moreover, in making this accusation, the Plaintiffs in essence ask this

21

Court to look beyond the written agency decisions into the subjective intentions of the Forest Service and the Supervisor. "Courts should not conduct far-flung investigations into the subjective intent of an agency." National Audubon Society v. Department of Navy, 422 F.3d 174, 198 (4th Cir. 2005). Nor should courts "probe into the subjective predispositions of agency decisionmakers ... [because] the test for NEPA compliance is one of good faith objectivity rather than subjective impartiality." Id. (internal quotation and citation omitted). To the extent that the Plaintiffs claim that the EA was prepared in order to support a prior determination to close the System,

> NEPA of course prohibits agencies from preparing an [EA] simply to "justify ... decisions already made." But the evidence [courts] look to in determining whether this has taken place consists of the environmental analysis itself. It does not include, as plaintiffs suggest, the alleged subjective intent of the agency personnel divined through selective quotations from [the administrative record, such as the allegations of "private meetings"]. Where an agency has merely engaged in *post hoc* rationalization, there will be evidence of this in its failure to comprehensively investigate the environmental impact of its actions and acknowledge their consequences. This objective analysis is the full extent of [the] inquiry[.]

Id. at 198-99.

Here, the temporary closing of the System did not eliminate reasonable alternatives for the future. 40 C.F.R. §1506.1(a)(2). Indeed, the Forest Service proposed alternative plans on June 9, 2008 when it elicited public

comment on a proposal to reduce the size of the System. [AR 2824].
Furthermore, neither the 209 page Predecisional Environmental Assessment
nor the even longer final EA shows a "failure to comprehensively investigate
the environmental impact of [the agency's] actions [or] acknowledge their
consequences." National Audubon Society, 422 F.3d at 199.

Indeed, the Plaintiffs' conduct is an implicit acknowledgment that the
administrative process continued appropriately. In response to the December
2007 temporary closure, the Plaintiffs initiated the May 2008 litigation. After
they received the June 2008 report, however, they determined to dismiss that
litigation. In the Stipulation of Dismissal filed in October 2008, the Plaintiffs
included an express acknowledgment of the Forest Service's "intention to
complete a public planning process and to announce a new decision" which
they concluded "will likely substantially impact or change the interim order[.]"
[2:08cv11 at Doc. 40]. By this language, which the Plaintiffs were not required
to include in the dismissal, they acknowledged that the December 2007
closure was not final even though the decision had been temporarily
implemented. It likewise shows that the Forest Service did not "close first
then study," as Plaintiffs assert. [Doc. 33 at 26]. By virtue of the October 2008
dismissal of their litigation, the Plaintiffs were obviously content that the

23

administrative process was proceeding.

The Plaintiffs argue, nonetheless, that the outcome was predetermined because the Forest Supervisor announced that her preferred alternative was closure of the System. [Doc. 33 at 26]. In the Predecisional Environmental Assessment, the Supervisor noted that she could not recommend keeping the System open for OHV use. [AR 5700]. NEPA regulations, however, provide that the agency "shall ... [i]dentify [its] preferred alternative." 40 C.F.R. §1502.14(e). Indeed, the agency is allowed to "have a preferred alternative in mind when it conducts a NEPA analysis." Forest Guardians v. United States Fish and Wildlife Service, 611 F.3d 692, 712 (10th Cir. 2010). As such, this argument by the Plaintiffs is simply unsupported by the regulations.

For these reasons the Plaintiffs' assignment of error asserting that the Forest Service decision had been made prior to its undertaking the appropriate environmental review must be rejected.

**B. The Forest Service violated NEPA procedural requirements.**

**1. Improper Reliance on the Aquatic Insect Studies.**

The Plaintiffs argue that in preparing its Environmental Assessment, the Forest Service relied on insect studies that were never made publicly available for comment and which were misinterpreted by the Forest Service.

24

The studies at issue are a 2009 study conducted by Sheree Ferrell, a graduate student at Western Carolina University, and a 2009 study conducted by the North Carolina Department of Environment and Natural Resources (NCDENR). [Doc. 43 at 19]. According to the Plaintiffs, the failure to disclose this reliance violated NEPA regulations.

Plaintiffs' argument must fail because 1) they apply the incorrect regulatory standard, 2) the record does not support Plaintiffs' argument and 3) the Forest Service did not rely on the studies Plaintiffs cite. Each of these are addressed below.

In making this allegation, the Plaintiffs failed to note that the applicable regulations are those pertaining to Environmental Assessments, not Environmental Impact Statements.

> NEPA's public involvement requirements are not as well defined when an agency prepares only an EA [Environmental Assessment] and not an EIS [Environmental Impact Statement]. *Compare* 40 C.F.R. §1503.1, .4 (requiring agencies preparing an EIS to make an initial draft available for public comment and to consider "[d]evelop[ing] and evaluat[ing] alternatives not previously given serious consideration" in response to comments), *with id.* §1501.4(b) (requiring agencies to "**involve ... the public, to the extent practicable**, in preparing [EAs]")[.]

Greater Yellowstone Coalition v. Flowers, 359 F.3d 1257, 1279 (10th Cir. 2004) (italics in original; bold emphasis added); Delaware Dept. of Natural

25

Resources and Environmental Control v. U.S. Army Corps. of Engineers, 685
F.3d 259, 272 (3rd Cir. 2012).

In determining whether the Forest Service involved the public "to the
extent practicable," the Court considers that in the Predecisional
Environmental Assessment issued in February 2009, it included a paragraph
titled "Aquatic Insect Community." [AR 05554].  The Forest Service there
noted that the "aquatic insect community within the Upper Tellico River
watershed has been monitored since May 2007 by Western Carolina
University.  Preliminary results have been inconclusive (Ferrell unpublished
data).  In general, species diversity among all sites has been similar." [Id.].
On February 27, 2009, the Forest Service invited public comment.  [AR 5700].
This alone shows that public involvement had been invited with regard to this
issue.

In the Final Environmental Assessment, the Service repeated this
finding.

> The aquatic insect community within the Upper Tellico River
> watershed has been monitored since May 2007 by Western
> Carolina University.  In general, species diversity among all sites
> was similar for macroinvertebrates (Ferrell 2009).[13]  Ferrell (2009)
> also found a positive correlation of percent silt/clay particles and

_____

[13]The Ferrell study was apparently published between the preparation of the first
and second Environmental Assessment.

26

> small invertebrates (meiofauna). These results suggest that the
> sedimentation from the OHV activities has altered the aquatic
> invertebrates community at the smaller scale but the effects are
> reduced for the larger size invertebrates. A benthological survey
> was conducted by the NCDENR in 2009 within the Upper Tellico
> OHV Area. These surveys resulted in an excellent
> bioclassification for all streams surveyed (NCDENR 2009).

[AR 10714]. Moreover, the Forest Service concluded that "aquatic insects are generally poor indicators of ecosystem stress due to sedimentation," citing the NCDENR.[14] [Id.]. Contrary to the Plaintiffs' claim, this language shows that the Forest Service did not place heavy reliance on a reduction in the aquatic insect community to support its decision to close the System.

Notwithstanding these findings in the EA, the Plaintiffs argue that the Forest Service improperly relied on aquatic insect studies which did not support its conclusions. The Plaintiffs cite six occasions when the Forest Service referred to insect populations in response to written comments submitted during the public response period. In each response, however, the Forest Service noted that despite the "excellent" bioclassification of insects, those portions of streams adjacent to the System contained more silt and

---

[14]The Court has not considered an affidavit submitted by the Plaintiffs in support of their Motion for Summary Judgment in which Robert Kelley has opined to the contrary. [Doc. 35]. This document is not part of the Administrative Record and is therefore excluded. Tinicum Township, Pa., 685 F.3d 288 (citing 5 U.S.C. §706(2)(A)); Ohio Valley Environmental Coalition, 556 F.3d at 201.

27

sediment regardless of the impact on insects. [AR 10438, 10491, 10509, 10514, 10545, 10549]. More importantly, these references do not manifest any reliance on insect community populations. Rather, this finding relates to increased silt. This argument by the Plaintiffs is simply unsupported by the record.

**2. Issuance of an EA rather than an EIS.**

The next assignment of procedural error relates to the Forest Service's decision to issue an Environmental Assessment (EA) rather than an Environmental Impact Statement (EIS). An EIS is required when there is a proposal for major federal action which will significantly affect the quality of the environment.[15] <u>Save Our Cumberland Mountains v. Kempthorne</u>, 453 F.3d 334, 338 (6th Cir. 2006). When it is not clear whether an EIS is required, regulations direct the agency to prepare an EA. <u>Id</u>. (citing 40 C.F.R. §1501.4(b). An EA is a public document which a Federal agency must prepare in order to provide sufficient evidence and analysis to determine

---

[15]The Plaintiffs have attached to their motion a Notice of Violations of the Sedimentation Pollution Control Act dated March 29, 2011. [Doc. 34-2]. This document, stemming from a March 2011 incident, is not part of the Administrative Record. Even though documents that are not part of an administrative record may in limited circumstances be considered in determining whether the decision not to prepare an EIS was proper, <u>Ohio Valley Environmental Coalition</u>, 556 F.3d at 201, this document was not in existence at the time the Forest Service made its decision, and therefore could not have formed a basis for its decision to issue an EA rather than an EIS. For this reason, it will not be considered.

28

whether an EIS or a finding of no significant impact (FONSI) is warranted.  Id.

(citing 40 C.F.R. §1508.9).  It should aid an agency in complying with NEPA

when an EIS is unnecessary.  Id.  It should include discussions of the need for

the agency action, alternatives, the environmental impacts of each and a

listing of the agencies and individuals consulted.  Id.  "If after preparing an

[EA] the agency determines that the project will have no significant

environmental consequences, it need not issue an [EIS] and instead may

issue a finding of no significant impact[.]"  Id.

In this case, after preparing the EA, the Forest Service concluded that

closing the System would not significantly impact the environment and,

indeed, would  halt significant negative impacts on the environment.  It thus

issued a finding of no significant impact.

> In deciding, on the basis of the assessment, whether the
> proposed action is one affecting the quality of the environment
> "significantly," the agency must look at both the "context" of the
> action and its "intensity."   40 C.F.R. §1508.27 (a) and (b).
> "Intensity," §1508.27(b) explains, means "the severity of impact."
> This choice of adjectives is significant, we think; one speaks of the
> severity of *adverse* impacts, not *beneficial* impacts.  If the agency
> reasonably concludes, on the basis of the [EA], that the project
> will have no significant adverse environmental consequences, an
> [EIS] is not required.  In such event, the agency must publish a
> finding of no significant impact.

Friends of Fiery Gizzard v. Farmers Home Administration, 61 F.3d 501, 504-

29

05 (6th Cir. 1995) (emphasis in original; internal quotation and citation omitted)." NEPA does not require that the agency find absolutely no adverse consequences in order to avoid the preparation of an EIS. Id. It merely requires that the agency find there will be no *significant* adverse impacts. Id.

The Plaintiffs argue that the preparation of an EIS is required any time agency action will have a consequence on the public's use of a public resource. Imposing such a requirement on agencies would, however, render the regulation meaningless. Virtually every EA or EIS is related to use of the public lands or their resources advocated by a private party applicant or the agency. Sierra Club v. Lujan, 949 F.2d 362, 370 (10th Cir. 1991). Thus the position Plaintiffs advocate would require an EIS in *all* cases. See also, Heartwood, Inc. v. U.S. Forest Service, 380 F.3d 428, 434 (8th Cir. 2004) (noting much of the EA addressed public concerns and finding EIS not required).

Here, the Supervisor for the Forest Service noted that, considering the context (§1508.27(a)) and intensity (§1508.27(b)) of impacts, closing the System would not have a significant effect on the quality of the human environment and, thus, an EIS need not be prepared. [AR 10626]. Specifically, in considering context, she considered the significance of the

30

action on society as a whole, the affected region, the affected interests and the locality. §1508.27(a). The Supervisor noted that the closing was limited to the local area and there were other off-road opportunities close by. [Id.]. The economic effects were solely local, although the social impact might be more regional. [Id.].

Concerning intensity, the Supervisor considered the severity of impact. §1508.27(b). Section 1508.27(b)(1) provides that impacts may be both beneficial and adverse. Thus, "a significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial." 40 C.F.R. §1508.27(b)(1). Here, after considering each of the factors related to intensity, the Supervisor concluded that closing the System would not have any *significant* adverse impact. In so doing, the Supervisor found closing the System would not affect public health or safety and would not affect the unique geographic characteristics of the area, considering historic and cultural resources, wetlands, floodplains and wilderness areas. [AR at 10627]. She also noted that the area was eligible for designation in the Wild and Scenic River systems. [Id.]. The Supervisor noted some controversy surrounding the decision to close the System and referred to the discussions of that topic. [Id.]. The impact of closing the System, she noted, would not involve unique

or unknown risks, since closing roads and trails are common practices. [Id.].

Because the decision to close the System was based on the unique characteristics of this area, the Supervisor noted it would not establish precedent for future closings. [Id.]. Further, the cumulative significant impacts were discussed by the Supervisor who found that while no endangered species or wildlife would be negatively impacted, the same might be positively improved. [Id. at 10627-28]. Finally, no federal, state or local environmental laws would be infringed; in fact, to the contrary, water quality would be improved. [Id.].

Here, the fifteen page Decision Notice and Finding of No Significant Impacts repeatedly cited to specific portions of the 253 page EA. [AR 10614-29]. The Forest Service considered both context and each of the ten factors related to intensity. Umpqua Watersheds v. United States, 725 F.Supp.2d 1232, 1241 (D.Or. 2010). Since none of those ten factors were present, it was not necessary for the Forest Service to prepare an EIS. Id. Plaintiffs argued at the hearing on this matter that the findings regarding the ten factors was simply "a catalog of conclusions rather than a statement of analysis." The record, however, thoroughly supports the Forest Service's conclusions as to each of those factors. Moreover, the Forest Service gives more than two

32

pages of explanation in the EA as to how these findings are supported by the record. [AR10626-28]. This Court therefore finds those conclusions to be reasonable and not arbitrary or capricious. Id.; Western Watersheds Project v. Bureau of Land Management, 552 F.Supp.2d 1113, 1126 (D.Nev. 2008). "An agency's decisions are entitled to a presumption of regularity." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), overruled on other grounds Califano v. Sanders, 430 U.S. 99, 105, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). "In the absence of clear evidence to the contrary, the doctrine presumes that public officers have properly discharged their official duties." Butler v. Principi, 244 F.3d 1337, 1340 (Fed.Cir. 2001). This Court's role "is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." Northwest Bypass Group v. U.S. Army Corps of Engineers, 470 F.Supp.2d 30, 61 (D.N.H. 2007) (quoting Coalition on Sensible Transportation, Inc v. Dole, 826 F.2d 60, 66 (D.C. Cir. 1987). In issuing the FONSI in this case, the Forest Service considered and discussed the relevant environmental concerns, identified and took a "hard look" at the problems and convincingly explained why its finding was made. Id. It did not act arbitrarily or capriciously. Id.

33

### 3. Procedures for Amending the Forest Plan.

The Plaintiffs next argue that the Forest Service violated NEPA procedures in amending the Forest Plan. As part of its decision to close the System, the Forest Service amended the Forest Plan to remove the Tellico OHV System from the list of recreational off-road areas in the Forest. [AR 10653-54]. This, the Plaintiffs argue, violated NEPA which calls for an EIS and detailed amendment proceedings before implementing an amendment to the Forest Plan.

The correct procedure for amending a Forest Plan depends on the scope of the amendment. Lands Council v. Martin, 529 F.3d 1219, 1227 (9th Cir. 2008). If the amendment is significant, more detailed amendment proceedings are required. Id. The regulations, however, "leave to the discretion of the Forest Service the question of whether any given amendment is significant." Id. (internal quotation and citation omitted). In making that determination, the Forest Supervisor should consider the four factors listed in the Forest Service Handbook: timing, location and size; goals; objectives and outputs. Id. Mere disagreement with the Supervisor's conclusion is not sufficient grounds to interfere with her discretion. Id.

The Plaintiffs argue that the Supervisor here only considered two of the

34

four factors prescribed in the Forest Service Handbook. They do not, however, identify which factors they contend were considered and which were not. The Supervisor actually made the following findings and conclusions in the Decision Notice and Finding of No Significant Impact concerning the adoption of Alternative C which would close the System and thus require amendment of the Forest Plan:

> I have determined this amendment is not a significant amendment under the ... NFMA implementing regulations ... Forest Service Manual 1926.51 - Changes to the Land Management Plan that are Not Significant and FSM 1926.52 - Changes to the Land Management Plan that are Significant. Based on these planning requirements, I have determine that:
>
> • This amendment will not significantly alter levels of goods and services projected by the forest plan; nor will it prevent the opportunity to achieve those outputs in later years. Recreation opportunities will continue to be available in the area although the nature of those opportunities will change. The availability of other goods and services will not change.
>
> • This amendment will not affect a large portion of the planning area during the planning period. The affected area represents about 1.3% of the Nantahala National Forest.

[AR 10628].

The second finding specifically addresses the size and location of the area effected by the amendment, and the timing of the action. The first finding

35

expressly addresses the outputs, and addresses the goals and objectives related to goods, services and recreation opportunities. Lands Council, 529 F.3d at 1227. How the Plaintiffs contend these findings fail to address all four factors is not clearly articulated. Having properly determined that the amendment was not significant, no further procedures were required. Id. The Plaintiffs' argument on this point is not supported by the record.

For the reasons set forth above, the Court concludes that the Forest Service did not violate the procedural requirements of NEPA. Therefore these assignments of error are overruled.

### C. The Forest Service acted arbitrarily and capriciously.

The Plaintiffs' final challenge is that the Forest Service's closure of the System was arbitrary and capricious because it was based on a legally erroneous conclusion.

### 1. Violations of Water Quality Standards.

According to the Plaintiffs, the decision to close the System was based on the erroneous conclusion that the Forest was violating North Carolina water quality standards.

> [B]ecause the Administrative Procedure Act ... governs [this]
> review of claims brought under the NEPA, [the Court] may set
> aside the agency's action only if it is arbitrary, capricious, an
> abuse of discretion or otherwise not in accordance with law. This

36

involves a searching and careful, but ultimately narrow and highly deferential, inquiry. In the end, if the agency has followed the proper procedures and if there is a rational basis for its decision, [this Court] will not disturb its judgment.

Webster, 685 F.3d at 422.

Under the APA, the arbitrary and capricious standard is extremely narrow and this Court may not substitute its judgment for that of the agency. U.S. Postal Service v. Gregory, 534 U.S. 1, 6, 122 S.Ct. 431, 151 L.Ed.2d 323 (2001); Inova Alexandria Hospital v. Shalala, 244 F.3d 342, 350 (4th Cir. 2001). This standard has been equated to the "substantial evidence test." 5 U.S.C. §706(2); Hodges v. Abraham, 300 F.3d 432, 449 n.17 (4th Cir.), cert. denied, 537 U.S. 1105, 123 S.Ct. 871, 154 L.Ed.2d 775 (2003); AllCare Home Health, Inc. v. Shalala, 278 F.3d 1087, 1089 (10th Cir. 2001). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Platone v. U.S. Dept. of Labor, 548 F.3d 322, 326 (4th Cir.), cert. denied ___ U.S. ___, 130 S.Ct. 622, 175 L.Ed.2d 478 (2009) (internal quotation and citation omitted).

Federal agencies, like the Forest Service, are required by the Clean Water Act to comply with state water quality standards. 33 U.S.C. §1323(a). The streams located within the System and affected by the trails therein are designated as Class C Trout Waters. [AR 10643, 10645]. North Carolina

water quality standards require that turbidity in trout waters may not exceed 10 Nephelometric Turbidity Units (NTUs). 15A N.C.Admin.Code §02B.0211(3)(k). [Doc. 40-1 at 21]. Where turbidity exceeds that level because of natural background conditions, the existing level of turbidity may not be increased. Id.

The Plaintiffs assert that there are insufficient findings in the EA to support the conclusion that this standard was violated. Particularly, the Plaintiffs assert that there are no findings as to the turbidity level under natural background conditions. The Forest Service counters by pointing to the following findings in the EA:

> Turbidity measurements from the Tellico River have been recorded up to 370 NTUs at the state line during storm events.
> ...
> During a run-off event occurring on March 4, 2008, the 10 NTU state standard was exceeded in virtually all surveyed streams.
> ...
> Surveys conducted during 2007 and 2008 assessed trail conditions and sediment delivery from the OHV System. These surveys have identified elevated levels of erosion and sediment delivery to stream channels in the watershed as a result of failed BMPs. Therefore, the turbidity standard is not being met in the upper Tellico River watershed.
> ...
> Streams in the upper Tellico River watershed during 1999-2008 show higher turbidity ... values where trails occupy the drainage.

[AR 10645, 10682-83].

The Plaintiffs argue that these findings only show that the Forest Service measured turbidity levels during storm or run-off events, and not under natural background conditions. Therefore, the Plaintiffs conclude, no violation has been demonstrated. [Doc. 33 at 32]. The Forest Service, on the other hand, argues that run-off events are simply the product of naturally occurring storms and showers, and as such are precisely the sort of natural conditions contemplated in the regulation.

This question hinges on the proper interpretation of the regulation. The issue before this Court, however, if very different. The Court is presented with two different interpretations of the meaning of "turbidity levels which exceed 10 NTUs due to natural background conditions." It is not a question for this Court to determine which interpretation is correct. The only question before this Court is whether the interpretation of the Forest Service is arbitrary or capricious. "Our highest deference is owed to the Forest Service's technical analyses and judgments within its area of expertise[.]" League of Wilderness Defenders Blue Mountains Biodiversity Project v. Allen, 615 F.3d 1122, 1131 (9th Cir. 2010). Thus, the agency's scientific conclusion that a comparison of turbidity levels during storm events shows a violation of state law is entitled to deference. Klamath Siskiyou Wildlands Center v. Grantham, 424 F. App'x.

635, 637 (9th Cir. 2011). The interpretation of the Forest Service is a logical construction of the regulation and the Plaintiffs have not shown that such an interpretation is contrary to case law or inconsistent with the agency's regulations or other law. <u>Native Ecosystems Council v. U.S. Forest Service</u>, 418 F.3d 953, 960 (9th Cir. 2005).

Thus, taking the Forest Service's reasonable interpretation of the regulation, the findings in the EA are sufficient to show a violation of the turbidity standard. Since the Forest Service found the natural background turbidity to exceed 10 NTUs, the Forest Service must further show that the trails increase the turbidity. The Forest Service explained, however, that turbidity levels measured during storm events in undisturbed areas (areas in which no off-road vehicles are used) are lower than those measured during storm events within the System (where such vehicles are used) is evidence that state law is violated within the System due to increased sediment. The evidence in the Administrative Record supports this conclusion.

For these reasons, the determination by the Forest Service to close the trails based on the violation of the turbidity standard was not arbitrary or capricious.

40

## 2. Application of the No Visible Sediment Standard.

The Plaintiffs next argue that "the Forest relied on an erroneous 'no visible sediment' standard to justify total closure of the System." [Doc. 33 at 33]. The standard, they claim, applies only to a streamside management zone which would encompass only about one mile of trail within the System. [Id.]. Applying this standard to close the entire System, they argue, was therefore arbitrary and capricious.

The Forest Plan, however, states that visible sediment must be prevented from *reaching* perennial and intermittent stream channels.[16] [AR 10644]. The Plan does not limit the application of this prohibition to streamside management zones. [Id.]. Field surveys conducted in 2007 and 2008 identified 2,003 sources of visible sediment along the 39 mile trail system. [Id.]. "Management of national forest lands must be consistent with the governing forest plan." Greater Yellowstone Coalition, Inc. v. Servheen, 665 F.3d 1015, 1031 (9th Cir. 2011) (citing 16 U.S.C. 1604(i)) (other internal quotation and citation omitted). Compliance with the Forest Plan, therefore, is clearly not arbitrary or capricious. Id.; Alliance for the Wild Rockies v. Tidwell, 385 F. App'x. 732 (9th Cir. 2010). This Court, moreover, "defer[s] to

---

[16]The Plaintiffs do not attack the validity or legality of the Forest Plan.

41

the Forest Service's reasonable interpretation of the Forest Plan's requirements." Id. (citing Ecology Center v. Castaneda, 574 F.3d 652, 661 (9th Cir. 2009)); San Bernardino Valley Audubon Society v. F.E.R.C., 242 F. App'x. 462, 4465 (9th Cir. 2007). Because the Forest Service reasonably interpreted the Forest Plan requirements, its conduct was neither arbitrary nor capricious.

The Plaintiffs also argue that the Forest Service should have amended the Forest Plan to delete the requirement that no visible sediment reach perennial and intermittent stream channels. The Forest Service, however, is obligated to comply with North Carolina state law, which requires the Forest Service to avoid visible sediment in streamside management zones. 15A N.C.Admin.Code 4B.0113; N.C. Gen. Stat. §113A-57 (the North Carolina Sedimentation Pollution Control Act or SPCA). As applied to Trout Waters, state law requires the Forest Service to maintain a buffer between eroding off-road vehicle trails and streams, with that buffer being 25 feet wide "or of sufficient width to confine visible siltation within ... 25% of the buffer zone nearest the land-disturbing activity, whichever is greater." N.C. Gen. Stat. 113A-57(a). The Forest Service documented visible sediment leaving off-road vehicle trails and entering streams.

42

As previously noted, the Clean Water Act requires each state to develop and implement water quality standards to protect and enhance the quality of water within the state. 33 U.S.C. §1313. That same Act requires all federal agencies to comply with those state requirements. 33 U.S.C. §1323. Because the Forest Service could not implement and maintain Best Management Practices (BMPs) which would meet the cited state law requirement,[17] closure of the System was not arbitrary and capricious. Colorado Wild, Heartwood v. U.S. Forest Service, 435 F.3d 1204 (10th Cir. 2006).

### 3. Supervisor's Reference to Protecting the Trout Population.

Lastly, the Plaintiffs claim the Forest Service tailored the decision to close the System to the Supervisor's subjective belief that she needed to do whatever was possible to protect the trout population. [Doc. 33 at 34]. In so doing, they argue she failed to consider the System for multiple use. [Id.].

This claim is based on language contained within the Decision Notice

---

[17] The Forest Service documented BMP failures, first noting that the trails and roads do not comply with current state and Forest Service standards. [AR 10674]. "Applying BMPs that are designed for constructing and maintaining trails to today's standards are not sufficient to correct for the deteriorated conditions identified by conditions surveys of the Upper Tellico OHV System." [Id.]. Among the factors that limited the ability of BMPs to be effective were the fact that the soil in the System was sensitive to erosion, a high degree of precipitation, "trails not within a design standard," "a high level of use, year round use, modified vehicle types," and "long term severe erosion that transcends our ability to employ standard BMPs." [AR 10675].

43

issued by the Forest Service and signed by its Supervisor. [AR 10614-10629].

The Supervisor announced the decision to close the System, identified and

discussed the various alternatives to closure, considered mitigation measures,

explained the need to comply with the Forest Plan and state law, and provided

the rationale for the decision. [Id.].  The Supervisor noted that BMPs could not

improve the situation and, indeed, could not be implemented due to the age

of the System. [AR 10618-19].  She cited violations of North Carolina water

quality standards as well as the Forest Plan's "first priority" to protect the

habitat of wild streams, which within the area of the System contain brook

trout. [AR 10619].  The increased production of sediment, it was noted, had

negatively impacted brook trout spawning and would continue to do so. [Id.].

Included in the Rationale was the Supervisor's statement that

> I have an obligation as a land manager to do all I can do to reduce
> the human induced sedimentation from Trails 2 through 12 and
> lessen this environmental stressor to the aquatic resources.  This
> will help ensure meeting water quality standards and support
> long-term persistence of brook trout within the watershed.

[AR 10625].

Based on this statement, the Plaintiffs argue that the decision to close

the System was arbitrary and capricious.  As previously noted, however, the

decision to comply with the Forest Plan and state law water quality standards

44

was not arbitrary or capricious. <u>Colorado Wild</u>, 435 F.3d at 1217. The Supervisor's statement merely announced her obligation to follow both the Forest Plan and state law. The role of this Court does not include divining the "alleged subjective intent of agency personnel." <u>National Audubon Society</u>, 422 F.3d at 199. The test for NEPA compliance "is one of good faith objectivity rather than subjective impartiality." <u>Id</u>. at 198 (internal quotation and citation omitted). "This objective analysis is the full extent of [the Court's] inquiry, and [it will] therefore express no opinion as to the [Supervisor's] motivations here." <u>Id</u>. at 199.

For the reasons stated, the Court finds and concludes that the Forest Service was not arbitrary and capricious in its decision to close the System. Therefore, this assignment of error must be overruled, and the Court concludes that the Defendants are entitled to judgment as a matter of law.

## II. The Defendants' Motion for Summary Judgment.

The Defendants cross-moved for summary judgment. Most of the arguments made in their motion are actually responses to the Plaintiffs' claims, [Doc. 39 at 21-23; 24-35], which are addressed above.

The Defendants raised one claim in support of summary judgment which was not previously considered. Citing 36 C.F.R. §212.55, the Defendants

45

argue that the Travel Management Rule required the Forest Service to close trails which are causing considerable adverse effects and which cannot be maintained in a financially and environmentally sustainable manner. That regulation requires the Forest Service to consider the availability of resources for the maintenance and administration of National Forest trails and roads as well as the effects of those roads on soil, watershed, vegetation, wildlife and wildlife habitats. 36 C.R.F. §212.55. Included within the EA is a financial analysis of the comparable financial costs of each alternative to final closure.[18] [AR 10864-68]. Alternative C, final closure, presented the most financially feasible option. In light of the violations found by the Forest Service, and the fact that the option of closure of the System was the most financially advantageous, the Travel Management Plan supported the closure. The Plaintiffs did not respond to this portion of the Defendants' motion. The Court concludes that the Defendants are entitled to judgment as a matter of law on this ground as well.

### III. The Intervenor-Defendants' Motion for Summary Judgment.

The Intervenor-Defendants also moved for summary judgment, making

---

[18] The Forest Service even included the financial analysis Alternative A, which was to take no action at all, even though this alternative would have allowed the violations cited above to continue.

Case 2:10-cv-00015-MR-DCK   Document 47   Filed 09/19/12   Page 46 of 50

arguments which have been considered in the context of resolving the Plaintiffs' motion. For the reasons previously stated, the Intervenor-Defendants and the Defendants are entitled to judgment as a matter of law on each of those issues.

The Intervenor-Defendants also raised a claim that the closure orders were required by another provision of the Travel Management Rule, 36 C.F.R. §212.52. That regulation provides in pertinent part:

> If the responsible official determines that motor vehicle use on a National Forest System road or National Forest System trail or in an area on National Forest System lands is directly causing or will directly cause *considerable adverse effects* on ... soil, vegetation, wildlife, wildlife habitat, or cultural resources associated with that road, trail or area, the responsible official *shall immediately close that road, trail or area to motor vehicle use* until the official determines that such adverse effects have been mitigated or eliminated and that measures have been implemented to prevent future recurrence.

36 C.F.R. §212.52(b)(2) (emphasis added).

Based on the studies and surveys conducted during 2007, the Supervisor concluded that the December 2007 interim closure was warranted due to the amount of sediment reaching streams and the severe erosion within the System. [AR 2141-45]. Contained within both the Predecisional Environmental Assessment and the EA are numerous citations to scientific data showing that the use of off-road vehicles within the System was causing

47

and would continue to cause considerable adverse effects on soil, trout, the Tellico River and the areas within the System. [AR 5509-11, 5514-19, 5521-22, 10645-46, 10673, 10683-86, 10685-89, 10712, 11673, 2027]. Those effects included the erosion of 75,000 tons of soil, visible sediment reaching the river and streams, high turbidity, and decreased trout reproduction. [Id.]. The Forest Service had "the discretion to immediately close certain trails, even if those trails are otherwise designated as appropriate for motorized use in a travel plan, provided that the motorized use is causing 'considerable adverse effects.'" Idaho Conservation League v. Guzman, 766 F.Supp.2d 1056, 1062 (D.Idaho 2011). "Only the Forest Service can decide when to exercise this discretion." Id.

In reply to the Defendants' position that the decision was not predetermined,[19] the Plaintiffs stated that the Travel Management Rule did not provide an excuse for the closures because the Defendants failed to show considerable adverse effects. [Doc. 41 at 5]. The EA, however, contains substantial findings regarding these adverse effects, as set forth above. For this reason, as well as for the other reasons set out herein, the Defendants

---

[19] Other than this portion of the Plaintiffs' reply on the predetermination issue, the Plaintiffs have not responded at all to the arguments pertaining to the Travel Management Rule.

48

and Intervenor-Defendants are entitled to judgment as a matter of law.

## VI. Conclusion.

The Court finds that the Forest Service "took a hard look at the environmental consequences of the proposed action." Webster, 685 F.3d at 422. Both the Predecisional EA and the final EA show that a thorough investigation was conducted into the environmental impacts of closure as compared to the continued maintenance of the System. Id. If the Court were to accept the Plaintiffs' positions, it would amount to "flyspeck[ing]" of the Forest Service's "environmental analysis, looking for any deficiency, no matter how minor." Id.

The decision of the Forest Service was not arbitrary, capricious, or an abuse of discretion, and it was in accordance with the law. Id. at 423. Having conducted "a searching and careful, but ultimately narrow and highly deferential inquiry," the Court concludes that the Forest Service followed the proper procedures and that there is a rational basis for its decision. Id. The decision of the agency will therefore not be disturbed. Id.

## ORDER

**IT IS, THEREFORE, ORDERED** as follows:

1. The Plaintiffs' Motion for Summary Judgment [Doc. 32] is hereby

49

**DENIED**.

2.     The Defendants' Motion for Summary Judgment [Doc. 38] is hereby

**GRANTED**.

3.     The Intevenor-Defendants' Motion for Summary Judgment [Doc. 40] is

hereby **GRANTED**.

Judgment is entered simultaneously herewith.

Signed: September 18, 2012

Martin Reidinger
United States District Judge